Martin, J.,
sitting for Harper, J.,
delivered the opinion of the Court:
That whatever a defendant refers to in his answer, as a par* of it; was to be received as evidence, (so far as the answer itself could be so considered,) I had supposed too well established to admit of a doubt. Yet that question is made in the first ground of appeal, and has been insisted on in the argument.
The plaintiffs charge the marriage of the defendants’ mother to one Black, many years before their birth, and call on them *107 to answer as to that fact. In answering, the defendants say they cannot be supposed to know any thing in relation to this subject, except what they have heard; .and, having seen and read their mother's answer, they refer to that and adopt it as their own, “as containing information they have heard and beliese.” ,. Their-mother’s answer, then, was a part of their own; for they adopt it, and ask leave to refer to it, as their own. if they had not been állowed to do so, it would seem that a defendant could never give in answer an exhibit, unless it was incorporated, in Jicec verba, in his answer. It.will not be pretended, I presume, if the defendants had set. out Mrs. Fryer’s answer in their own, and averred their belief of its truth, and adopted it as their own, that it would have been irrelevant, impertinent or objectionable. 'There is no difference between that course and the one .they adopted.
The rule contended for,, that the answer of one defendant is not evidence for another defendant, is obviously inapplicable to the case. Mrs. Fryer’s answer was not, in fact, read .as her answer, but as part of the answer of the other defendants.
I cannot suppose it necessary to investigate the competency of Black’s declarations. The plaintiffs gave his declarations in evidence repeatedly; and it was, surely, competent for the defendants to disprove his assertions by his own contradictions.
The third ground maintains, the marriage of Rachel Nichols to Black, and that he was alive at her marriage to Fryer. The Chancellor who heard, and had the most favorable opportunity to estimate the testimony, thought it did not establish the marriage contended for, and we concur with him. I will add, that it would seem to me, his analysis of the testimony must lead any dispassionate mind to the same conclusion.
For my own part, I should, under the very extraordinary facts of the case, have been satisfied with less than the defendants have proved. For more than thirty years, Fryer and their mother have lived together as man and wife, under what they supposed, and under what I now believe, to have been a lawful marriage. During all this time, it is admitted, they were exem *108 plary and respected members of society. They reared a family, who are also respectable, and whose legitimacy was not questioned until about the time of the filing of this bill, although the youngest is the mother of a family. Who, then, would bastardize this whole family, unless forced, by indubitable testimony, to do so ? No one, I am sure, but the plaintiffs, who are so far influenced by pecuniary considerations as to forget what is due to the memory of their father, and rendered willing to bring odium upon those who are allied to them in blood. And who would not, in this case, seize on every fair and rational doubt, to shield all concerned from the imputations which the plaintiffs are endeavoring to fix on them indelibly ? All, I am sure, who appreciate domestic tranquility.
But the Chancellor’s decree, as I conceive, does not rest, for support, on these views. The evidence, on a careful analysis, not only does not support the case made by the bill, but, in point of fact, establishes the legitimacy of the defendants.
If it were not so, a question of much difficulty might arise, if it be taken as proved (and I think it clearly established) that the testator supposed his marriage to Rachel lawful and valid. Did the Legislature, by the Act of 1795, intend to embrace such a case? I am glad that it is not necessary to express an opinion on a question of such difficulty.
The view I have taken of the third and principal ground relied on, renders it unnecessary to say any thing on the fourth.
The last ground supposes a case not made by the pleadings. It is true that, by the testator’s will, the residuum of his estate is divisible between the plaintiffs and defendants, after the death of the widow, and it is true she has died since the filing of the bill. But the bill did not seek distribution of that residuum, nor were the plaintiffs entitled to it when the bill was filed. They have not filed a supplemental bill. They had other objects in view, and, for aught that appears, this matter is suggested for the first time in the appeal. If a proper case was not made, that is not the fault of the Court.
It is doubtful whether a Chancellor would have allowed the *109 plaintiffs, in such a case, to have availed themselves of the accidental death of Mrs. Fryer, to have amended their claim. I incline to the opinion that such permission would have been granted, if granted at all, only upon payment of costs. But I do not think the plaintiffs have any claim upon the discretion of this Court; as they made no (application oh the Circuit, it must be -refused here. . _
The decree is affirmed, and the appeal dismissed.
JohNson and O’Neall, JJ., concurred.

Appeal dismissed.

Note.— In Stringfellow vs. Scott, at Barnwell, February, 1833, the following interesting circuit opinion, on the law of marriage, was delivered, by
Harper, Ch. The complainants charge that they are the lawful children of Richard .Stringfellow, deceased, by his first wife ; that the defendant was living in adultery with him for some time previously, and at the time of his death; and that, by his will,, he bequeathed to her his whole estate, for life, and after her death, to his children by her, in violation of the Act of the Legislature, forbidding any person, having a lawful wife or legitimate children, from giving more than one-fourth of his estate to a mistress or illegitimate,children. The answer of the defendant admits that she did cohabit with the deceasod, during the life time of his second wife; but states that,'after the second wife’s death, she was regularly married to him. There was no direct proof of the death of the second wife. It was proved that she was in the neighbpurhood of her deceased husband and defendant some fourteen or fifteen years ago 3 that she went to. Tennessee, and was in a state of derangement, and it does not appear that she has been heard of for the last ten or eleven years. One witness stated that- he heard of her death, eight or nine years ago. Under these circumstances, the law infers the death of the second-wife, during the period she has not been heard of. There was no proof of the defendant’s having been married to Stringfellow, except that, during the period mentioned, they cohabited, and recognized and treated each other as’man and wife. In his will, also, he speaks of her as his wife. These circumstances, it was argued, are sufficient to raise tho presumption of a marriage between them. - Under the ¡English law, as it exists at present, in all cases except prosecutions for bigamy and actions for criminal conversation, marriage may be proved by circumstances such as these. I should consider these rebutted, however, by the admitted faet'of their cohabitatibn haring been adulterous initscommencement; and this would throw on defendant the burden of proving a formal* marriage. I agree, however, with the defendant’s counsel, that, under our laws, marriage is regarded as merely a civil contract, requiring no particular formality, which may be made by a private agreement between the parties, and which is capable of being proved by cwcum-stances, as any other contract may be proved. The English statute, 26 Geo. 2, c. 33, which is that by which restrictions in relation to the forms of marriage have been im *110 posed in that country, has never been adopted in this State. Blackstone (1 Com., 433-4,) says, “ Our law considers marriage in no other flight than as a civil contract. And, taking it in this civil- light, the law treats it as it does all other contracts : allowing it to b'e good and valid, in all cases where the parties, at the time of making it, were, in the first place, willing to contract, secondly, able to contract, and lastly, actually did contract, in the proper forms and solemnities required by law;” and (at p. 439) “ lastly, the parties must not only bo willing and able to contract, but must actually contract themselves, in due form of law, to mako it a good civil marriage. Any contract made per verba cle prcesenti, or in words of the present tense, or, in case of cohabitation, per verba defuturo} also between persons ablo to contract, was, before the late act, deemed a valid marriage, for many purposes, and the partios might bo compelled, in the spiritual courts, to celebrate it in facie ecclesiceP So, in Bunting's case, Moore, 170; 4 Co., 29, Agnes Addingshall was contracted to Bunting, (per verba de prcesenti} as is stated in the report in Coke, though.this does not appear from the report in Moore.) She afterwards married Twine. Being sued in the spiritual court by Bunting, the marriage with Twine was declared void, and the sentence ■was, that she should marry and cohabit with Bunting, which she did. They had a son, and the question in the Civil Court was of his legitimacy. It was argued, that having been married to Twine in facie ecclcsice, this was valid until a regular divorce in a proceeding to which Twine should have been a party. But it was held that the marriage with Twine was void, and the issue with Bunting legitimate. Moore says, the first cause was for this, that Agnes was first contracted to Bunting: in which case, she was his lawful wife in the civil law, for it is said, that if they have carnal copulation, after the contract, they shall not be punished for adultery or fornication, but only for contempt against an edict of the Church. It is also said, that if a legacy bo given to a woman when she shall become a wife, if she contracts herself, she may demand her legacy in the Spiritual Court before espousals celebrated: by which it appears, in construction of the civil law, the woman is uxor before the espousals, and so, if she be married, after the contract, and before the espousals, to a stranger, those espousals are void. It is said that before the time of Pope Innocent the Third; there was no solemnization of marriage in the Church; but the man came to the house which the woman inhabited, and led her home to his house, which was the only ceremony then used. So the law is laid down by Lord Holt, in Collins vs. Jesson, 6 Mod., 155, 2 Salk., 437, and Widmore's case, 2 Salk., 438, that a contract per verba de prcesenti, “ I marry you,” and “ I and you are man and wife,” constitutes an actual marriage, only that, if they cohabit before solemnization in facie ecclesice, they are punishable by ecclesiastical censure. If the contract bo per verba de futuro^ " I promise to marry you,” this will bo a marriage, if it be followed by actual consummation. The subject is fully considered by Sir William Scott, in the great case of Dalrymple vs. Dalrymple, (2 Hagg. Cons. R. 62; Car. L. J., 384,) respecting a Scotch marriage, in which he treats it not only as a question of Scotch law, but of the general law of all Europe, founded on the canon law. Before the Council of Trent, he says, “the consent of the two parties, expressed in words of present mutual acceptance, constituted an actual and legal marriage, technically known by the name, sponsalia per verba de prcBseniiP “ In the promise, or sponsalia de futuro, nothing was presumed to bo complete or consummate, either in substance or ceremony. Mutual consent might release the parties from their engagement, and one party, without the consent of the other, might contract a valid marriage, regularly or irregularly, with another person; but if the parties, who had exchanged the promise, had camal intercourse with each other, the effect of the carnal intercourse was to interpose a presumption of present consent, at the *111 time of the intercourse, to convert the engagement into a regular marriage, and to produce all tho consequences attributable to that species of matrimonial connexion.35 He refers to Brower and to Swinburn, on Spousals, where the subject is fully treated.
It is said, 4 Bac. Abr. 536, Tit. .Marriage and Divorce, 0., to have been, by a constitution of Archbishop [Reynolds, directed, that marriage shall be solemnized reverently, and in the face of tho Church. But it is unnecessary to multiply authorities on this subject.
There is no doubt at all but that, by the law of England, independently of the Statute 26, Geo. 2, a contract per verba de preesenti (or per verba de futuro,) consummated by carnal intercourse, constitutes a valid marriage, indissoluble by the parties, and rendering the subsequent marriage of one of the parties absolutely void. The only difficulty arises from what is said in some of the authorities, that, “ in order to malee the marriage eom-ploto, so as to entitle the wife to dower, the children to inherit, etc., the same must bo celebrated in facie ecclesice.” 4 Bac. Abr. 531. Tho author refers to Boll. Abr. 357, and to the ease before quoted from Moore. I have not tho means of referring to Bolle. In the case in Moore, it is said, that the children born after tho contract, and before the espousals, are legitimate, provided espousals succeed: for if espousals never succeed, tho issue is bastard. I do not find this, however, said by Coke, (a higher authority,) in reporting the same case, under the title of Bunting vs. Lepingwell, (4 Co., 29.) Co. Lit., 34, a, has .been sometimes referred to as an authority, that, to entitle the wife to dower, the marriage must be solemnized in fade ecclesice. But he only says, that “this dower {ad ostium ecclesice,) is ever after marriage solemnized,33 as, from the very nature and definition of it, it must have been. C(Bt sciendum est, quod hccc constitutio fieri debet in facie ecclesice, et ad ostium ecclesice; non enim valet factain lecto mortali, vel in camera, vel altli ubi clandestina fuere conjugia.” He loaves it rather to be inferred, that the solemnization was not necessary to the other species of dower treated of. In Yin. Abr. Tit. Marriage, it is said, “if E. be divorced from her Baron, causapree contractus, made with another per verba de preesenti, immediately by tho sentence given in the Court, tho marriage shall be consummated between the said 3?. and her first Baron, without any rites to be in facie ecclesice. Otherwise, in contracts per verba de futuro.” In Haydon vs. Gould, Salk. 119, where tho parties had been married by a layman, it was held, that tho husband was not entitled, in the Spiritual Court, to administration of the estate of his deceased wifo : “for ho, demanding a right due to him as husband, by the‘ecclesiastical law, must prove himself husband, according to that law, to entitle himself, in this caso: and though, porhaps, it should be so, that the wifo, who is the weaker sex, or the issue of the marriage, who are in no fault, might entitle themselves, by such marriage, to a temporal right, yet tho husband himself, who is in fault, shall hover entitle himself, by the mere reputation of marriage, without right.33 Indeed, however natural it may be to suppose that tho ecclesiastical tribunals would refuse their aid to one who had acted in contempt of an edict of the Church, yet if, as all the authorities agree, the civil contract of marriage was complete and perfect, without celebration in facie ecclesice, it seems something absurd and inconsistent, that one claiming a mere civil right, in a civil tribunal, should be repelled on the ground of his ecclesiastical irregularity. I am confirmed in this opinion, as all the other authorities, except those I have mentioned, which treat of the subject generally, seem to regard the marriage as complete, for all civil purposes, without celebration, and say nothing of any such disability of the wife, or issue of such marriage. So it is treated by Chief Baron Comyn, (a much higher authority than Bacon,) Tit. Baron and Eeme, B. By quoting from Salkeld, that where there is a marriage in fact, only the wifo or her children, who were not in fault, may be entitled to a temporal right, he seems to adopt that opinion.
*112 Jews are excepted out of tlio English marriage Act; and in tho case of Lindo and Belisario, 1 Hagg. Cons. R. 231, in which, the validity of a Jewish marriage was elaborately investigated, the inquiry was, whether it was a marriage according to their usages-Not, of course, on the ground of any sanctity or authority in those usages, but to determine whether it was what they regarded as a valid contract. Tho English Court could only have regarded it as a civil contract.
But whatever the case may be in England, yet it is clear that, with us, the marriage is complete, for every purpose, by the contract, without celebration. We have no Church, recognized by law, in tho face of which the spousals might be celebrated. There is no Spiritual Court to compel parties to solemnize them, or to inflict spiritual censure if they refuse. We have retained the name of ordinary; but that, of necessity, must be regarded as a mere temporal Court, for the transaction of testamentary matters. Our present constitution has put an end to all connection between Church and State. To say the celebration in facie ecclesiai was necessary, would be to invalidate tho numerous marriages made by justices of the peace, and, indeed, most of those made by the clergy: for, by the laws of England, all the Protestant dissenting clergy are regarded as laymen, and we have not adopted tho English statutes, giving them validity on certain conditions. Indeed, it appears, that before our revolution, and while the Church of England was established in the Stato, it was common to celebrate marriages before justices of tho peace. By the Act of 1706, commonly called the Church Act, penalties are imposed on any justice of the peace who shall celebrate a marriage; but the marriage itself is not declared void. The custom wasno doubt derived from the practice, during the time of the English commonwealth, of colobrating marriages before justices of the peace. Regarding marriage merely as a civil contract, this was adopted as a convenient method of authenticating it. And though, afterwards, in the time of Charles the Second, it was thought advisable to pass an Act for confirming those marriages; yet I find no authority for supposing that they would have been regarded as invalid, without the statute.
The circumstances which tend to establish a matrimonial contract, in this case, I have already mentioned. For a long time, they recognized and treated each other as man and wife. In genoral, this would be sufficient of itself. It would amount to an admission of the matrimonial contract. But, for aught that appears, they treated each other in the same manner during the life time of Richard Stringfellow’s second wife, when no matrimonial connexion could exist between-thenu Then, in his will) ho calls her his wife, and gives to her his whole estate. This is very strong, and seems to amount to an acknowledgment that she was his wife. I do not think, however, that 1 am tho proper tribunal to decide on the effect of these circumstances. The case of Fenton vs. Reed, 4 Johns. R. 52, was very much like the present. A woman married a second time, during the life of her first husband, which marriage was of course void. She continued to reside with the person to whom she was the second time married, for a long time after the death of her husband. They treated each other as husband and wife. The circumstances were left to the jury, to presume a contract of marriage after the death of the first husband, the Court holding a contract, 'per verba de presentí, to be as valid a marriage as if made in facie ecclesiai. A jury I think the proper tribunal for the determination of the question, and to a jury I shall send it. There is an infinity of circumstances, familiar to the vicinage, but unknown to me, which would have a bearing on the determination. The parties might call each other husband and wife, as a sacrifice to decency, and treat each other as such, it being well known to themselves, and to every one else, that they did not consider each other as standing in that relation. I think, to warrant the jury in finding a marriage, they ought to be satisfied that there was actually an agreement or understanding between them, after the death of Stringfellow’s second wife, to stand together in the relation of husbandand wife.
*113 As tho subject is an important one, and thero has been no legal determination upon it, so far as I know, I think it important that the principles of this opinion should be carried beforo the Court of Appeals. Not that I consider the law doubtful, but it concerns tho public that it should be definitely settled and made known.

Jewell vs. Magwood.

Before Martin, X, at Charleston, May, 1833. This was an appeal from the decision of the Ordinary, revoking letters of administration, which ho had granted to plaintiff, on tho ostato of Benjamin Jewell, on tho ground that plaintiff was an illegitimate son of said Jewell, and granting administration to defondant, Col. Magwood, as agent, or attorney, of Mrs. S. J. Jewell, who claimed it, as being the lawful widow of said Benjamin Jewell.
Tho witness produced, on behalf of plaintiff, was his own mother, Mrs. Storms, to prove her marriage and his own legitimacy. She was objected to, as being incompetent, as she would bo interested in tho distribution of tho estate, and as she could not be admittod to prove her own marriage and his legitimacy. She executed a release, and his Honor allowed her to be examined. She stated her marriage to Jewell about thirty-four or fivo years beforo, at Savannah; that it was not solemnized either by a priest or public officer; that a ring was presented her by Jewell, as a token sufficient, and that there were soveral persons present; that she was a Roman Catholic, born at Cape Francois, and Mr. Jewell a Jew; that they romovod afterwards to Barnwell, in this State, and thence to Charleston; that they had eight children, of whom plaintiff was one, born in Decomber, 1798; that their births were mentioned in a Bible.
On her cross-examination, she stated that she married Storms about fourteen years ago, in tho life time of Jewell, who died in 1828; that she and Jewell separated, and lived apart; that she took a conveyance of a houso and lot in King-street from him, which she paid for to Mm, and that she knew of his marriage, in Virginia, to Mrs. Jewell, who now claims to be his widow. She recognized her handwriting to a paper, dated Savannah, March 10th, 1796, by which she, by her then name, Sophie Prevost, released B. Jewell, for the sum of 8500, from all responsibility, on account of a promise of marriage alleged to have been made to her, and for which she had sued him, etc.
Mr. Barbott testified, that he was clerk for Jewell in 1806, and that plaintiff’s mother passed as Jewell’s wife.
Mr. Galtonncl knew Jewell from 1796: plaintiff’s mother was treated by him as his wife.
Mr. Manks, for defendant, testified, that Jewell was married, in Virginia, during the late war, to Ms present widow, who now lives in Louisiana.
Defendant’s counsel contended, that thero was no ovidence of the alleged marriage of tho intestate to S. Provost; that she herself was incompetent to prove it; that the release of her interest in the estato was insufficient, as her husband, Storms, did not join in it; that her subsequent marriage with him showed her opinion of the connexion with Jowell being only a common cohabitation; and that, on tho whole, she was not entitled to bo believed, under the circumstances in evidence.
His Honor charged the jury, that if they believed her testimony, as to the marriage in Savannah, no subsequent acts between her and Jewell, or of either of them, could invalidate the contract.
The jury found a verdiot for the plaintiff, and the defendant appealed, and moved for a new trial.
Lance, Petigru, for appellant.
Thompson, contra.
*114 The opinion of the Court was delivered by
Harper, J. The first question relates to the competency of the witness, Mrs. Storms, to prove her own marriage, and the legitimacy of her son. I do not perceive that she was incompetent, within the rules which the law has fixed for ascertaining a witness’s interest. The interest which will disqualify must be direct: the witness must gain or lose by the event of the suit, or the verdict must be evidence for or against him, in some other suit which may arise. It is not enough, that the witness may have an interest in the same question, which may hereafter come to be determined in another cause. How, certainly Mrs. Storms gains nothing directly by the event of this litigation, or the granting of administration to the plaintiff. If she should hereafter claim a distributive share of the intestate’s estate, as his widow, either in the Court of Ordinary or of Equity, this verdict will not be evidence for or against her, though, to he sure, the samo question, the fact of marriage, will be in issue. If the administrator should pay over to her a distributive shave of the estate, it will bo at his own risk, and that of the sureties, if another person should afterwards show herself entitled as widow. This renders it unnecessary to consider the question of tho sufficiency of the releaso.
The remaining grounds of appeal relate merely to the evidence, and were matter for tho jury. In a decree delivered by me, sitting for the Chancellor at Barnwell, in 183S, I had occasion to consider the subject fully, of what will constitute marriage in this State. Certainly, by our law, marriage is regarded only as a civil contract, and whatever is sufficient evidence of the assent of the parties’ minds to enter into that relation, establishes a marriage. This may he either per verba de preesenti, <e I take you for my wife,” etc., or per verba de futuro, an agreement to marry in future, with subsequent cohabitation. Where parties agree to marry in future, and afterwards cohabit, the law infers that this cohabitation was an execution of the previous agreement. Like other contracts, it may be proved by circumstances, as by the parties living together, and speaking of, or treating each other as husband and wife. Certainly, it is one of the most important engagements into which human beings can enter, and ought not to bo established on light or uncertain evidence. But in the case before us, leaving out of question the rebutting testimony, tho evidence in favor of the marriage was very conclusive. Independently of the direct testimony of Mrs. Storms, the very long cohabitation, with the circumstances attending it, treating each other in every respect as husband and wife, would have justified the verdict of the jury. But the evidence on the other sido was also very strong. Their separation, and the subsequent marriage of both, was evidence that they did not regard each other as ever having sustained the relation of husband and wife. Then the paper mentioned in the brief, purporting to havo been executed at Savannah, on the 10th March, 1796, and that produced before us, said to have been executed on their separation in 1810, were very strong to show the same thing. But then those papers were not properly in evidence before the jury, at least with respect to the former — it was for the jury to say whether it was sufficiently proved or not. If they had been in evidence, however, they would not have boon entirely conclusive. If the marriage became complete, (and if Mrs. Storms is to be believed, hers was so,) no subsequent act or acknowledgment of the parties would invalidate it. Certainly, there were circumstances which went very strongly to discredit the witness, Mrs. Storms; hut we cannot, where there is a conflict of testimony, take from the jury tho right to judge of it. The motion is dismissed.
Johnson, J., concurred.

 That is, actual, positive proof, but not in facie ecclesicB.