MONTGOMERY TANK LINES and Protective Insurance Company, Petitioners,

v.

WORKERS' COMPENSATION APPEAL BOARD (HUMPHRIES), Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Dec. 21, 2001.

Decided Feb. 8, 2002.

Rhonda A. Rudman, Pittsburgh, for petitioners.

George John Steffish, III, Butler, for respondent.

Before PELLEGRINI, Judge, FRIEDMAN, Judge, and FLAHERTY, Senior Judge.

PELLEGRINI, Judge.

Montgomery Truck Lines (Employer) petitions for review of a Workers' Compensation Appeal Board (Board) order affirming the decision of the Workers' Compensation Judge (WCJ) granting Raymond Humphries' (Claimant) review petition, amending Claimant's notice of compensation payable to include a psychiatric injury, and requiring Employer to reimburse Claimant's counsel for costs in the amount of $373.10.

On January 13, 1986, Claimant sustained a work-related injury to his right knee, head, ribs and severe trauma to his head in a work-related motor vehicle accident while he was working as a truck driver for Employer. Accepting the injury, Employer issued a notice of compensation payable acknowledging Claimant's injury which was described as "bumped & cut head, possible rib injury, broken right leg" and began paying Claimant workers' compensation benefits. Subsequently, pursuant to a stipulation of the parties and a commutation order dated January 20, 1998, Claimant's benefits were commuted and Employer was only required to continue paying medical bills in connection with the work-related injury. However, alleging that Employer failed to pay reasonable and necessary medical expenses related to the work injury, Claimant filed a penalty petition on May 4, 1998.[1] Employer filed an answer denying that any related expenses remained unpaid.[2]

Before the WCJ, Claimant's wife, Mary Humphries, testified describing Claimant's condition after his accident as disheveled, his head bloody and extensively bandaged. Although Claimant had been taken home after the accident, Mrs. Humphries testified that her husband was taken to the hospital shortly thereafter where he was admitted. She stated that following the accident, her husband was not the same, he was irritable, refused to see anyone and was withdrawn. She testified that she began to notice progressive personality changes in her husband, making him aggressive and unreasonable to the point that he was admitted to a psychiatric center in 1994 and had been hospitalized for aggressive and disordered behavior on nu-

---

1. In his petition, Claimant alleged that Employer violated the Workers' Compensation Act (Act), Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1–1041.4, 2501–2626, by refusing to pay a bill from Sewickley Valley Hospital in the amount of $368.00 and prescription bills totaling $7,012.01.

2. During the proceedings before the WCJ, the parties stipulated that the expenses in question were for psychiatric care and medication. Because a psychiatric injury had not been acknowledged by Employer in connection with the January 13, 1986 accident, Claimant's petition was amended to be a review petition seeking to add a psychiatric injury to the injuries recognized by the notice of compensation payable.

merous occasions thereafter.[3]

Over Employer's objection, Claimant also presented the medical reports of Alfred P. Sylvester, M.D. (Dr. Sylvester), Mark D. Miller, M.D. (Dr. Miller) and M.H.V. Murthy, M.D. (Dr. Murthy).[4] In his report, Dr. Sylvester stated that he began treating Claimant in November 1994. Based upon Claimant's symptoms and his examination, which included neuropsychological testing and an interview with Claimant's wife, he stated that Claimant suffered from dementia due to frontal lobe disease of a type which can be preceded by head injury. Dr. Sylvester opined that Claimant's dementia, personality changes and his resultant need for psychiatric treatment were related to his work injury. Dr. Miller stated that he had treated Claimant since June 23, 1998, when Dr. Sylvester left the area. Based on his review of Claimant's records, medical history and examination, Dr. Miller opined that Claimant suffered from a "bipolar-like" condition, vascular dementia and behavioral disturbances, and that such mentally disabling symptoms originated from Claimant's truck accident-related injuries.

In opposition to Claimant's petition, Employer offered the medical report of John Talbott, M.D. (Dr. Talbott). Based upon a review of Claimant's medical records, history and examination, Dr. Talbott noted that Claimant had slowly evolving mental changes from around the time of his work injury, first becoming serious in 1994. He characterized the injury to Claimant's head as minor and concluded that Claimant's psychiatric problems were due to generalized cerebrovascular disease caused by non-work related diabetes and hypertension.

Employer also offered the medical report of Stuart Burstein, M.D. (Dr. Burstein). Dr. Burstein stated that after reviewing Claimant's medical records, speaking with Claimant's wife and conducting a mental status examination, Claimant was disheveled, had a flat affect, exhibited erratic, inappropriate behavior and lacked inhibition. He opined that Claimant suffered from dementia due to small vessel ischemic disease from aging, diabetes and hypertension unrelated to the January 13, 1986 accident. Like Dr. Talbott, Dr. Burstein also characterized Claimant's head injury as mild.[5]

■ Finding the reports of Drs. Sylvester and Miller more credible and persuasive than those of Drs. Talbott and Burstein, the WCJ concluded that Claimant

3. Claimant also testified on his own behalf. The WCJ found him not credible because he was a poor historian and his testimony was confused and disordered.

4. In his January 25, 1999 report, Dr. Murthy stated that he first saw Claimant on January 14, 1986, when he arrived at the Suburban General Hospital emergency room following his accident. At that time, Claimant was diagnosed with a concussion, laceration to right forehead, hematoma to the occipital area, fractures of the 8th and 9th ribs on the right side and fracture of the tibial plate right knee. He also opined that given Claimant's chronological problems, it was likely that his mental disorder was related to the injuries sustained in the accident. After a second review of Claimant's records, Dr. Murthy stated in his May 27, 1999 report that he believed with reasonable medical certainty that Claimant's medical condition was directly related to the injuries sustained in the work-related accident.

5. Employer also offered into evidence medical records from Salem Community Hospital, where Claimant was treated following the January 13, 1986 accident. Those records indicated that Claimant presented with lacerations to the right parietal area, a large hematoma on the scalp frontal and parietal area, pain to his right knee, left elbow and ribs and denied any loss of consciousness.

had established he suffered from dementia, mood disorder and a bipolar-like condition as a result of his work injury on January 13, 1986, which required psychiatric treatment and medication and amended the notice of compensation payable to include that psychiatric injury directing Employer to pay for all medical expenses and prescriptions attributable to that injury. Employer then appealed the order to the Board which affirmed the WCJ's decision. This appeal followed.[6]

## I.

Initially, Employer contends that the WCJ erred in admitting Claimant's medical experts' reports over its hearsay objection because, although Claimant was not seeking weekly disability benefits, his medical treatment and medication for those problems extended beyond 52 weeks, and the case did not involve less than 52 weeks, making them inadmissible under Section 422(c) of the Act, 77 P.S. § 835. That section provides in relevant part:

\* \* \*

Where any claim for compensation at issue before a workers' compensation judge involves fifty-two weeks or less of *disability,* either the employe or the employer may submit a certificate by any health care provider as to the history, examination, treatment, diagnosis, cause of the condition and extent of disability, if any, and sworn reports by other witnesses as to any other facts and such statements shall be admissible as evidence of medical and surgical or other matters therein stated and findings of fact may be based upon such certificates or such reports. Where any claim for

compensation at issue before a workers' compensation judge exceeds fifty-two weeks of disability, a medical report shall be admissible as evidence unless the party that the report is offered against objects to its admission. (Emphasis added.)

Claimant contends, however, that because his "claim for compensation" was for medical expenses for his psychiatric condition, no weekly disability benefits were at issue, i.e., zero weeks, making his physicians' medical reports admissible under the provision. In effect, what this case is asking us to address is whether a claimant who files a compensation claim only for medical expenses is ever required to present additional medical evidence other than a medical report to support his claim.

In *Ruth Family Medical Center v. Workmen's Compensation Appeal Board (Steinhouse),* 718 A.2d 397 (Pa.Cmwlth. 1998), a case similar to this one, we addressed whether medical reports were admissible to support a claim for medical benefits beyond 52 weeks. In that case, the claimant filed a claim petition seeking compensation for injuries she suffered to her neck and back in a motor vehicle accident on October 5, 1988, while driving from St. Agnes Medical Center where she treated patients of her employer to her employer's offices for her regular office hours. Before the WCJ, the claimant offered into evidence three medical reports as medical evidence in support of her claim. Finding that the claimant's injury occurred during the course and scope of her employment but that she failed to prove any wage loss from April 1989 to March 1990 that was causally related to the accident, the WCJ awarded her all

---

**6.** Our scope of review in a workers' compensation appeal is limited to determining whether an error of law was committed, constitutional rights were violated, or whether

necessary findings of fact were supported by substantial evidence. *Pruitt v. Workers' Compensation Appeal Board (Lighthouse Rehabilitation),* 730 A.2d 1025 (Pa.Cmwlth.1999).

medical expenses but suspended compensation benefits as of October 5, 1988, the date of the accident. The claimant and employer filed cross-appeals to the Board which affirmed the WCJ.

On appeal, the employer argued that the WCJ erred in accepting the claimant's medical reports into evidence because her claim was for a period in excess of 52 weeks because the medical treatment for which the claimant sought reimbursement occurred over a period of five years making the reports inadmissible. However, concluding that the critical term in Section 422(c) was the term "disability" and for workers' compensation purposes, "disability" was synonymous with "loss of earning power," we held that because the claimant sought compensation benefits for a loss in earning power from April of 1989 to March of 1990, a period of 49 weeks, her claim met the time limitations imposed by Section 422(c) and the WCJ properly admitted the medical reports. This holding is also consistent with the Section 422(c) language of "52 weeks of disability" because "weeks" only involves wage loss and not medical treatment.[7]

In this case, because Claimant is not seeking any compensation benefits for loss of earning power, he, therefore, is not seeking any compensation for "disability," and there was no claim for disability in excess of 52 weeks making the medical reports admissible. Accordingly, the WCJ did not err in admitting Claimant's medical reports over Employer's hearsay objection.

**II.**

Even if the WCJ properly admitted Claimant's medical experts' reports, Employer contends that the WCJ erred in relying on Claimant's wife's testimony because it was internally inconsistent as to when Claimant's behavioral changes occurred and was inconsistent with the medical records as to Claimant's injuries. In determining whether a witness's testimony is inconsistent, her testimony must be reviewed and taken as a whole and a final decision should not rest upon a few words taken out of the context of the entire testimony. *Lewis v. Workmen's Compensation Appeal Board (Pittsburgh Board of Education)*, 508 Pa. 360, 498 A.2d 800 (1985); *Indian Creek Supply v. Workers' Compensation Appeal Board (Anderson)*, 729 A.2d 157 (Pa.Cmwlth.1999).

As to Mrs. Humphries' testimony regarding the behavioral changes in her husband, our review of the record indicates that Mrs. Humphries began to notice changes in her husband soon after the accident, which included symptoms such as irritability and withdrawal from other people, including herself, which progressed into more severe symptoms and ultimately led to the hospitalization of her husband in 1994.[8] Because Mrs. Humphries' explana-

---

7. We note that while Section 422(c) of the Act allows hearsay medical reports into evidence because the opposing party receives the medical report in advance, if the party against whom the report is offered believes the amount at issue warrants the expense, the party can schedule the deposition of that medical expert. In effect, Section 422(c) of the Act merely shifts the costs of taking the deposition to the party objecting to the report.

8. During Mrs. Humphries' testimony, the following exchange took place:

Q: I am not asking you for a medical opinion now but when Ray came back from Bellevue Hospital to his home here, what was his condition, what did you see?
A: He wasn't the same. He was real irritable. He was throwing things at me and he never did. We are very close, so that is why I wouldn't put him away or something. He was irritable and wouldn't see no one, and he stayed in the little room he is in now. He couldn't walk. He had a walker, crutches, all of that. And I had a nurse here to help me. The hospital sent nurses

tion of the progression of her husband's mental problems from the period shortly following his accident up until the time that the severity of his symptoms required hospitalization was not inconsistent with her testimony on cross-examination that his condition gradually progressed, the WCJ did not err in relying on her testimony.

As to Employer's argument that the WCJ erred in relying on Mrs. Humphries' testimony because it was inconsistent with the medical records, Mrs. Humphries merely stated that she called the hospital in Ohio where her husband had been treated following his accident and was told that he had suffered a concussion. However, Mrs. Humphries' testimony was neither offered to establish that, in fact, Claimant had suffered a concussion nor did the WCJ's findings indicate that she relied upon that testimony in her determination.

### III.

■ Finally, Employer contends that the WCJ erred in granting Claimant's review petition because Claimant failed to

> to help to bath him because he was pretty well banged up.
> Q: Now, one of the things that has come up in this case, we have records from University of Pittsburgh Medical Center, Western Psychiatric Institute showing some testing and admission around April of 1997, and we have some records showing admission and treatment for the University of Pittsburgh Medical Center Western Psychiatric Institute for admission back in October of 1994. Before October of 1994, and after the time Ray was sent home from the Bellevue Hospital back in 1986, so we are talking about the symptoms from 1986 until October of 1994, what was Ray's condition? And again I don't want medical terms.
> A: I don't know medical terms.
> Q: I want you to tell us what you observed, what was his condition?
> A: Well, he was more with [sic] withdrawn. My Ray was very happy-go-lucky. If you broke down, he would help you. He would laugh. He would come home, and we would pick up, and go a lot. We would go to Beaver Falls just for a hot dog. He wouldn'g [sic] go out, he wouldn't let anybody in the house, wouldn't let anybody talk to me on the phone. I was ready to leave him then. I said this is not the guy I married. Part of my family don't come today yet. I mean he was just nasty. I don't need you, what are you doing here, and that wasn't Ray. The way I am treating [sic] is the way me and Ray always did. He wasn't right. I lost him a long time ago.
> Q: When you say you lost him a long time ago and he didn't act in a happy-go-lucky manner, is that the way he was acting when he was brought home from Bellevue, was

> he was [sic] acting mean and irritable or was he acting different than that?
> A: Right after that—Well, the first day I was there, they admitted him. I saw him that night and I went the next day, me and my brother, and we stayed with him all day and talked, and then the nurse come in, and she said she had to give him a shot, for me to go to the hallway. She came out and said you better go home, he is yelling. I have to call the doctor. He is yelling my damn wife, do you think she would come to see me, I am here all alone. I was there all day. He is telling her I went out and never came back, and they knew I was there all day. Doctor Murthy wouldn't let me come up for a few days. I don't know what was going on, and I called him, and he said he was taking MRI's, and things that had to pertain to that. That was the worst part.
> (Notes of Testimony, December 11, 1998, at 11–13.) On cross-examination, the following exchange took place:
> Q: And in 1994, did you tell the hospital that your husband's psychiatric problems had gradually progressed up to that point?
> A: Yes. They were asking me different things and they told me, what they told me, didn't you notice there was a change, why didn't you do something about it, and I didn't know what happened. I didn't know I was supposed to do something. I knew he was irritable and he wasn't the same. He just wasn't the same.
> Q: And had he become more irritable over time?
> A: Yes.
> (Notes of Testimony, December 11, 1998, at 33–34.)

establish that the psychiatric injury was a result of his January 13, 1986 accident because the medical reports were based on Claimant's medical history provided by his wife that he suffered a loss of consciousness following the January 13, 1986 accident which was inconsistent with the medical records.[9]

As to Dr. Miller's report, Employer contends that Dr. Miller's statements that there was a "significant change in his mental functioning from the moment he had the accident" and that Claimant's "work capabilities ceased the day he had the truck accident" were inconsistent with the evidence. However, as to the change in Claimant's mental functioning, Dr. Miller's statement was clearly supported by Mrs. Humphries' credible testimony that Claimant's behavior and mental state began to change after the accident, evolving to the point that Claimant required hospitalization to treat his condition. As to Employer's assertion that Dr. Miller's report was inconsistent with the facts because he found that Claimant was unable to work when Claimant had worked following the accident, while it is true that Claimant performed activities such as working at a social club doing odd jobs, Claimant had to quit those jobs due to his illness, making Dr. Miller's finding that he was unable to work consistent with the evidence. Because Dr. Miller's findings and opinion were supported by credible evidence of record, the WCJ did not err in relying on his report in granting Claimant's petition.

■ As to Dr. Sylvester's report, Employer argues that because that report relies on Mrs. Humphries' assertion that Claimant suffered a loss of consciousness following his accident, it was inconsistent with the medical records from Salem Community Hospital where Claimant was treated following his accident. Because the Salem Community Hospital emergency room records did not document a loss of consciousness but rather specifically noted that Claimant denied such an occurrence, and Dr. Sylvester's diagnosis was made based, in part, on an erroneous medical history, the WCJ erred in relying on his report.

■ Because the WCJ's Findings of Fact and Conclusions of Law do not specify the extent to which she relied on the individual reports of Dr. Miller and Dr. Sylvester in making her determination, we remand the matter for a determination based solely on Dr. Miller's medical report. Accordingly, we vacate the decision of the Board and remand for the WCJ to make new findings.[10]

### ORDER

AND NOW, this *8th* day of *February,* 2002, the order of the Workers' Compensa-

---

9. The emergency outpatient records from Salem Community Hospital, the hospital where Claimant was treated on January 13, 1986, immediately following the accident, including an emergency room report and ambulance report, indicated that Claimant denied any loss of consciousness.

10. Employer also contends that the WCJ erred in failing to file a reasoned decision as required under Section 422(a) of the Act, 77 P.S. § 834, because the WCJ failed to address certain exhibits submitted by Employer. However, contrary to Employer's argument, Section 422(a) of the Act does not require the WCJ to address all of the evidence presented in a proceeding in her adjudication. Rather, the WCJ is only required to generally set forth the reasons for making the finding and is only required to make those findings necessary to resolve the issues that were raised by the evidence and which are relevant to making the decision. *Daniels v. Workers' Compensation Appeal Board (Tristate Transport),* 753 A.2d 293 (Pa.Cmwlth.2000). Because the WCJ was not required to discuss all of the evidence presented and clearly set forth the reasons for her decision, she met the requirements of Section 422(a).

tion Appeal Board, No. A00–0478, dated January 31, 2000, is vacated and the matter is remanded to the Workers' Compensation Appeal Board to remand to the Workers' Compensation Judge for findings consistent with this opinion.

Jurisdiction relinquished.