**PNC BANK CORPORATION,**
Petitioner,

v.

**WORKERS' COMPENSATION APPEAL BOARD (STAMOS),**
Respondent.

Commonwealth Court of Pennsylvania.

Argued Oct. 9, 2002.
Decided Sept. 17, 2003.

■■■■■■■■■■

Joseph A. Fricker, Pittsburgh, for petitioner.

Stephen J. O'Brien, Pittsburgh, for respondent.

BEFORE: COLINS, President Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, LEADBETTER, Judge, COHN, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge LEADBETTER.

In this appeal we are called upon to address the issue left open by our Supreme Court in *Staudenmayer v. Staudenmayer*, 552 Pa. 253, 714 A.2d 1016 (1998), to wit: the continued viability of the doctrine of common law marriage. PNC Corporation (PNC), employer of decedent, Janet Stamos, appeals the order of the Workers' Compensation Appeal Board (Board), affirming the grant of John Kretz's fatal claim petition after concluding that the Workers' Compensation Judge (WCJ) properly concluded that Kretz was the common law spouse of Stamos. PNC argues both that the doctrine of common law marriage ought to be abandoned, and that even if it is not, Kretz failed to meet the heavy burden of proof required to establish such a union. For the reasons that follow, we hold that the time has come to abolish the doctrine, but that this decision should be given purely prospective effect. Because we further conclude that there was substantial evidence to support the findings of fact upon which the WCJ rested her decision, we affirm the order of the Board.

◼ In 1997, Kretz filed a fatal claim petition alleging that he was the common law spouse of Stamos, who died in an airplane crash in 1994 while working for employer. The nature of Kretz's relationship with Stamos was the subject of the hearings that followed before the WCJ. In Pennsylvania, "a common law marriage can only be created by the exchange of words in the present tense ['*verba in praesenti*'], spoken with the specific purpose that the legal relationship of husband and wife is created by that." *Staudenmayer*, 552 Pa. at 261–62, 714 A.2d at 1020 (footnote omitted).[1] In order to establish the

---

1. This rule applies when parties are available to testify regarding the exchange of words. If the parties are not available, a rebuttable presumption in favor of common law marriage is allowed where there is sufficient proof of cohabitation and reputation of marriage in the

requisite *verba de praesenti*, Kretz submitted into evidence a document entitled, "Affidavit of Eligible Member of Iron Workers Benefit Plans of Western Pennsylvania Common Law Spouse."[2] The affidavit stated, in pertinent part:

I, John A. Kretz, in support of my request to include my spouse, Janet Stamos, as a beneficiary under the Iron Workers Welfare Plan of Western Pennsylvania, Iron Workers Pension Plan of Western Pennsylvania, and Iron Workers Local No. 3 Annuity Plan, aver that on or about the 15th day of June, 1988, we, the undersigned, having the capacity to marry, did unite ourselves in marriage through the mutual exchange of words which expressed .our present intent to live together as husband and wife; and further, since the aforementioned dated [sic] we have openly lived together as husband and wife, and are so accepted by our family, friends and community.

By signing this affidavit, I understand that my spouse will be legally eligible for any pension and/or annuity benefits upon my death. I also understand that my spouse must now sign and agree to any withdrawals from my pension and/or annuity plans. I also understand that in order to remove my spouse from my coverage, I must obtain a legal divorce.

Hearing of July 23, 1997, Claimant's exhibit 1. Both Kretz and Stamos signed the affidavit on December 22, 1990 and their signatures were notarized.

Kretz also testified to the circumstances surrounding the execution of the affidavit. According to Kretz, the couple signed the affidavit because they were consolidating their benefits and insurances and he wanted to insure that if anything happened to him, his assets would go to Stamos. Kretz testified that prior to signing the affidavit, he and Stamos discussed the date of their marriage in order to pick the date of their anniversary. He admitted, however, that he meant to indicate on the affidavit that their marriage occurred in 1989 rather than 1988 and that the 1988 date was a mistake.[3] Kretz also testified that he and Stamos began living together in June of 1989 and that they subsequently exchanged rings as a sign of their marriage. Kretz stated that their marriage was not taken lightly.

With respect to title to their property, Kretz testified that they did not have any jointly owned assets or debts. Although the couple was mutually dependent upon each other financially, they maintained separate bank accounts and the mortgage and deed to the couple's house, which was purchased in 1990, were in Stamos' name only. He also noted that they filed separate tax returns. In addition, Kretz offered into evidence credit card statements, cancelled checks and receipts to demonstrate the various activities and vacations that the couple took together. He also offered into evidence various sympathy cards that referred to Stamos as his wife.[4] Kretz testified that following Stamos' death, he was the main point of contact between the family and airline.

Kretz also presented the deposition testimony of Boe Gillespie, the Administrative Manager of the Iron Workers

---

community. *Staudenmayer,* 552 Pa. at 264, 714 A.2d at 1021.

2. The affidavit is a preprinted form with spaces for the member to provide his or her name, the spouse's name, the date of marriage and both parties' signatures.

3. Stamos was married to another man until December of 1988.

4. These documents were objected to on various grounds such as relevancy and hearsay.

Plans of Western Pennsylvania. According to Gillespie, once the common law spouse affidavit is executed, the participant cannot remove the spouse from coverage unless a divorce is obtained. In addition, a plan representative counsels participants regarding the import of executing the affidavit. Finally, employer offered into evidence Stamos' death certificate, which indicated that she was divorced and had no surviving spouse at the time of her death.

The WCJ found that:

The evidence establishes *verba de praesenti* between John Kretz and Janet Stamos. Submitted into evidence was the [Affidavit] completed December 22, 1990 by claimant and [Stamos] and notarized before a Notary Public. The affidavit provides that John A. Kretz requests to include his spouse, Janet Stamos as a beneficiary under the [Pension Plan]. The document sets forth that "we, the undersigned, having the capacity to marry, did unite ourselves in marriage through the mutual exchange of words which expressed our present intent to live together as husband and wife; and further, since the aforementioned date we have openly lived together as husband and wife, and are so accepted by our family, friends and community." While it may be suggested that the designation is only to provide health benefits not otherwise available to a non-spouse, the completion of the form entitles the "spouse to a marital interest in Pension and Annuity Plans. Once completed, the husband and wife status remains and requires spousal approval, via signature, for any withdrawals from the pension and/or annuity plans.

. . . .

The testimony of Mr. Kretz, and the common law spouse affidavit clearly establish that the parties had completed the verba de praesenti, the present intention to marry, required to establish a common law marriage. The parties set forth on December 22, 1990 the written words of their present intention to be married, had their written intention notarized at a magistrate's office. They discussed the date they desired to be their marriage date for their upcoming two year anniversary. Although the date listed on the form incorrectly listed June 15, 1988 instead of June 15, 1989, the parties executed the document setting forth their present intention to be married on December 22, 1990. There did not exist any impediment to the parties' marriage as of 1989 and therefore, clear and convincing evidence exists that the parties had repeated their verba de praesenti on December 22, 1990.

*Kretz v. PNC Bank Corp.,* Bureau Claim No. 983729, slip op. at 2–4 (WCJ's decision and order, April 28, 2000) (Findings of fact nos. 8 and 12). Based upon her finding that Kretz was married *via* common law marriage to Stamos at the time of her death, the WCJ concluded that Kretz was entitled to surviving spouse's benefits. On appeal, the Board affirmed.[5]

Relying on our Supreme Court's clearly articulated skepticism in *Staudenmayer* regarding the continued viability of the common law marriage doctrine in Pennsylvania, employer asks this court to abolish the doctrine as antiquated and lacking any valid purpose in today's society. Employer is correct that the Supreme Court has

---

5. The Board initially remanded to the WCJ so that Boe Gillespie's deposition transcript

could be made a part of the record.

clearly stated its disapproval of the doctrine.

■■■ As the Supreme Court noted in *Staudenmayer*, marriage is a "civil contract by which a man and woman take each other for husband and wife." 552 Pa. at 260, 714 A.2d at 1019. Two forms of marriage are recognized in Pennsylvania, namely, ceremonial, which involves a marriage performed by a religious or civil authority with the usual ceremony or formalities, and common law. *Id.* at 260–61, 714 A.2d at 1019. Notwithstanding the provision in Section 1301 of the 1990 Marriage Law (Law)[6] that "[n]o person shall be joined in marriage in this Commonwealth until a marriage license has been obtained," the Law explicitly left unchanged the judicially-created doctrine of common law marriage. 23 Pa.C.S. § 1103. Pennsylvania, however, is one of the minority of states that continue to recognize common law marriages. *See Staudenmayer*, 552 Pa. at 261 n. 3, 714 A.2d at 1020 n. 3 (listing the 11 other states that recognize common law marriages).

The doctrine of common law marriage was recognized by the United States Supreme Court as early as 1877, *see Meister v. Moore*, 96 U.S. 76, 24 L.Ed. 826 (1877), and by the Pennsylvania Supreme Court as early as 1873, *see Richard v. Brehm*, 73 Pa. 140 (1873). Despite the well-established history of the doctrine, different views exist regarding its origins. In *A Feminist Proposal to Bring Back Common Law Marriage*, 75 Or. L.Rev. 709 (1996), Cynthia Grant Bowman provides an extensive historical review of common law marriages. According to Bowman's research, common law marriage in the United States stems from the informal marriages common in Europe prior to the Reformation. *Id.* at 718. Apart from the

nobility or wealthy, marriages were entered into without formality whereby a couple, perhaps in the presence of family members, would agree to be married and then begin living together as husband and wife. *Id.* Further, in the early Roman Catholic Church, marriage was viewed as a private contract based upon natural law. *Id.* Informal marriage continued to be recognized in England until 1753 when Parliament passed Lord Hardwicke's Act, which provided that only marriages performed by ministers of the Church of England would be recognized as valid. *Id.* at 719.

The migration of the English to the American colonies brought the practice of common law marriages to the United States. Two traditions followed: one view enacted legislation regulating marriage and abrogating the common law tradition and the other view continued to embrace the tradition received from English common law. For instance, the colonies that were settled by dissenters of the Church of England, such as Massachusetts, rejected canon law (and thereby common law marriage), adopting instead statutes and regulations as early as 1639 that required formal marriage ceremonies performed by designated officials. *Id.* Other colonies that were settled prior to Lord Hardwicke's Act continued the tradition of informal marriages found in English common law, simply assuming that such marriages continued to be valid. *Id.* at 719–20. In *Fenton v. Reed*, 4 Johns 52 (1809), the New York Supreme Court held that a contract of marriage made *per verba praesenti* constitutes a valid marriage.

Bowman opines that as settlement in America moved westward, common law marriages existed due to necessity. The country was sparsely populated and travel difficult such that it was often difficult to

---

6. 23 Pa.C.S. §§ 1101–1905.

have access to officials or clergy. *Id.* at 722.[7] In *Wifely Behavior: A Legal History of Acting Married,* 100 Colum. L.Rev. 957 (2000), Ariela R. Dubler proffers a different view of the creation of the doctrine:

> The vast majority of cases in which courts across jurisdictions pondered the validity and desirability of common law marriage shared a common sociological backdrop: female economic dependency. Almost all common law marriage cases involved women in need of financial support, and most were initiated by female plaintiffs. In many cases, a woman whose long-term domestic partner had died or deserted her came to court seeking judicial recognition of her terminated relationship as marital to enable her to inherit as a widow or to seek support as an abandoned wife. In other cases, one town brought suit against another town to determine which jurisdiction was responsible for the support of an indigent woman. Such "settlement cases" afforded the town in which the poor woman resided an opportunity to transfer the burden of her support to another town by declaring her the common law wife of a male resident of that other town.
>
> The doctrine of common law marriage provided judges with a way to privatize the financial dependency of economically unstable women plaintiffs. By declaring a woman to be a man's wife or widow at common law, courts shielded the public fisc from the potential claims of needy women, effectively deflecting those claims inward to a particular private,

family unit. In addition, holding a couple married at common law avoided branding their children with the legal status of illegitimacy.

> Moreover, common law marriage served another purpose: The doctrine allowed judges to efface the potentially threatening nature of nonmarital domestic relationships by labeling them marriages. Common law marriage thus transformed potentially subversive relationships—subversive in their disregard for the social and legal institution of marriage—into completely traditional relationships. In recognizing common law marriages, therefore, courts reinforced the supremacy of the institution of marriage by demonstrating that it could subsume under its aegis almost all long-term domestic forms of ordering.

*Id.* at 968–69 (footnotes omitted) [8]

According to Bowman, the first wave to abolish common law marriage in states recognizing it occurred between 1875 and 1917. 75 Or. L.Rev. at 731. The theories supporting criticism of and abolishment of the doctrine relate to: (1) urbanization and industrialization, which led to improved transportation and greater access to civil authorities, thereby removing many of the bars to a formal marriage; (2) increased wealth in private hands, which led to concerns of protecting inheritances from fraudulent claims and transmission of wealth to legitimate heirs; (3) increased emphasis on protecting the institution of marriage and viewing marriage as the "model and foundation of society and government;" and (4) racism, which led to the

---

7. Although a review of the full history of the early treatment of common law marriage in this country is not necessary, we note that Bowman's article also discusses the varying views found in the states settled by French colonists, Spanish colonists and states with large Native American populations.

8. *In re Estate of Soeder,* 7 Ohio App.2d 271, 220 N.E.2d 547 (1966), also provides a good historical discussion of the doctrine.

view that slaves, as property, lacked the capacity to enter into contracts, and sought to prevent interracial marriages. *Id.* at 731–46. While similar concerns motivated states to abolish the doctrine after 1920, the creation of new government benefit programs in the latter part of the twentieth century caused a new concern regarding the administrative burden required to sort through claims for benefits conditioned upon a marital relationship. *Id.* at 746–48.

Judicial criticism of the doctrine is abundant. In *Hewitt v. Hewitt*, 77 Ill.2d 49, 31 Ill.Dec. 827, 394 N.E.2d 1204 (1979), the Illinois Supreme Court noted:

"Despite its judicial acceptance in many states, the doctrine of common-law marriage is generally frowned on in this country, even in some of the states that have accepted it." (52 Am.Jur.2d 902 Marriage sec. 46 (1970).) Its origins, early history and problems are detailed in *In re Estate of Soeder* (1966), 7 Ohio App.2d 271, 220 N.E.2d 547, where that court noted that some 30 States did not authorize common law marriage. Judicial criticism has been widespread even in States recognizing the relationship. (*See, e.g., Baker v. Mitchell* (1941), 143 Pa.Super. 50, 54, 17 A.2d 738, 741, "a fruitful source of perjury and fraud ...."; *Sorensen v. Sorensen* (1904), 68 Neb. 483, 100 N.W. 930.) "It tends to weaken the public estimate of the sanctity of the marriage relation. It puts in doubt the certainty of the rights of inheritance. It opens the door to false pretenses of marriage and the imposition on estates of suppositious heirs." 7 Ohio App.2d 271, 290, 220 N.E.2d 547, 561.

*Id.* at 1211. Similarly, in *McCoy v. District of Columbia*, 256 A.2d 908 (App.D.C. 1969), the District of Columbia Court of Appeals opined:

[T]here is no statute in the District of Columbia on the subject of common law marriage. Accordingly, such a status is the product of an antiquated law and inattention to whether there is a need for a change. It cannot be gainsaid that few people really understand that such a marriage requires more than mere cohabitation coupled with adoption of the 'husband's' surname. Certainly most of those who live together in such a relationship lack any understanding of all the ingredients and permanency of such marriages. Indeed, experience reveals that many who believe themselves to be 'common-law' married have had one or more previous 'common-law' relationships without the benefit of divorce.

We commend to the attention of Congress the question whether such an informal and almost uniformly misunderstood status should not be abolished to end creation of such relationships in the future. The considerations which history teaches gave rise to judicial recognition of such informal and unrecorded marital agreements can hardly justify modern day perpetuation. Cost is certainly not prohibitory, and a plethora of public and quasipublic officials are available to solemnize such an important and socially significant occasion. Certainly, no one would contend that facilities for recordation are unavailable. Indeed, one might question whether any valid reason exists to encourage and sanction future circumvention of the established and salutary system for formalizing and recording marriages.

*Id.* at 910 (citations and footnotes omitted). And, in recognizing that N.J.S. 37:1–10 abolished common law marriage, the Supreme Court of New Jersey stated:

It was not without reason that our statute and similar statutes in other states have been popularly referred to

as "Heart Balm Acts." The many abuses arising from common law marriages, with their effect on public morality, private property rights and the legitimacy of children, called for correction. Our Legislature dealt with such mischiefs in this act in sweeping and emphatic language, permitting no exception or evasion....

*Dacunzo v. Edgye,* 19 N.J. 443, 117 A.2d 508, 514 (1955).

Criticism of the doctrine in Pennsylvania is long standing as well. In *Buradus v. General Cement Products Co.,* 159 Pa.Super. 501, 48 A.2d 883 (1946), *aff'd,* 356 Pa. 349, 52 A.2d 205 (1947), the Pennsylvania Superior Court opined:

There has been a growing judicial impatience of the invitation to perjury in cases depending for recovery on marriage at common law and a progressive change in judicial view requiring higher degrees of proof where such marriages are asserted.... But it is still not difficult for unprincipled claimants to convert illicit relationships into honest marriages, to their advantage, on spurious claims for workmen's compensation or against the estate of a decedent....

Marriage without civil or religious ceremony (perhaps mistakenly accepted here, as the then common law of England ...) is still valid, under the common law of Pennsylvania. And although, with the ready means of transportation everywhere available, common-law marriage may be an anachronism in the present day—born as it was of the exigencies of pioneer life—we have not presumed to question it as an institution sanctioned by our law.

*Id.* at 884–85 (citations omitted). In *In re Estate of Manfredi,* 399 Pa. 285, 159 A.2d 697 (1960), our Supreme Court opined:

[T]he law, or necessity, imposes a heavy burden on one who grounds his claim on an allegation of common law marriage. As said by President Judge Keller in *Baker v. Mitchell,* [143 Pa.Super. 50, 17 A.2d 738, 741 (1941)]: "The law of Pennsylvania recognizes common law marriages. But they are a fruitful source of perjury and fraud, and, in consequence, they are to be tolerated, not encouraged; the professed contract should be examined with great scrutiny, and it should plainly appear that there was an actual agreement entered into, then and there, to form the legal relation of husband and wife." ...

399 Pa. at 292, 159 A.2d at 700–01.

Most recently, in *Staudenmayer,* our Supreme Court in a plurality opinion reiterated the oft stated criticism, implying that the time had come to abolish the doctrine in this Commonwealth.[9] Justice

---

9. In *Staudenmayer,* the Supreme Court was presented with the issue of whether a couple had entered into a common law marriage prior to their ceremonial marriage taking place. Determination of the date of the parties' marriage was critical to the equitable distribution of the parties' marital estate as the husband received a large tort settlement while the parties were cohabiting but before their ceremonial marriage. The evidence demonstrated that the parties had cohabited together since 1976, had a daughter in 1979 and were married in a civil ceremony in 1984. Wife claimed that the parties entered into a common law marriage in 1978. In support of her claim, wife testified that in 1978, the couple maintained a joint checking account, she began using her husband's surname of Staudenmayer, she changed her social security card, driver's license and credit cards to identify her as Linda Staudenmayer, and the couple began filing joint tax returns. The evidence also reflected that wife reported the date of her marriage as 1985 in paperwork seeking support and that when the couple's daughter was born, wife wrote that she was "not married" in response to a question regarding her marital status. Finally, when asked when the couple expressed to each oth-

Newman, who was joined by Chief Justice Flaherty and [now Chief] Justice Cappy, noted that Pennsylvania is currently among the minority of states that recognize common law marriages and opined that:

> Because claims for the existence of a marriage in the absence of a certified ceremonial marriage present a "fruitful source of perjury and fraud," Pennsylvania courts have long viewed such claims with hostility. Common law marriages are tolerated, but not encouraged. While we do not today abolish common law marriages in Pennsylvania, we reaffirm that claims for this type of marriage are disfavored.

*Id.* at 261, 714 A.2d at 1019–20 (citations and footnotes omitted). The Court further commented that the doctrine's "continued viability is seriously in question"[10] but declined to consider its abolishment because the parties had not raised the issue. Justice Nigro, in a concurring opinion joined in by Justice Castille, urged the abolition of the doctrine, stating, "as marriage is necessarily an affirmative act, and ancient impediments no longer pertain, I would advocate the abolishment of common law marriage in Pennsylvania so that official records, and not the courts, may determine if and when the parties were married."

*Id.* at 268, 714 A.2d at 1023 (Nigro concurring).[11]

■ In this case, unlike *Staudenmayer*, the parties have preserved and fully argued the issue, so it is squarely presented for our consideration. Many sound reasons exist to abandon a system that allows the determination of important rights to rest on evidence fraught with inconsistencies, ambiguities and vagaries. The circumstances creating a need for the doctrine are not present in today's society. A woman without dependent children is no longer thought to pose a danger of burdening the state with her support and maintenance simply because she is single, and the right of a single parent to obtain child support is no longer dependent upon his or her marital status.[12] Similarly, the marital status of parents no longer determines the inheritance rights of their children.[13] Access to both civil and religious authorities for a ceremonial marriage is readily available in even the most rural areas of the Commonwealth. The cost is minimal, and the process simple and relatively expedient. Under Pennsylvania's statutory scheme, the fee for the issuance of a license is $3.00. 23 Pa.C.S. § 1105(a). Moreover, the license to marry authorizes the performance of a ceremony in any

---

er their intent to marry, wife answered, "Probably off and on all through the relationship ... [m]ostly from 1978 on, he always introduced me as his wife and we just presented ourselves as a[sic] married couple." *Staudenmayer,* 552 Pa. at 258, 714 A.2d at 1018 (quoting Notes of Testimony).

Common pleas concluded that wife failed to prove clearly and convincingly that the couple had exchanged *verba in praesenti,* or the present exchange of words spoken to establish a husband and wife relationship. The Supreme Court affirmed, noting in part that wife could not recall the "specific instance of when she and [husband] said to each other, 'we are husband and wife.'" *Id.* at 265, 714 A.2d at 1022.

10. *Id.* at 261 n. 4, 714 A.2d at 1020 n. 4.

11. Justice Zappala concurred in the result.

12. *See* 23 Pa.C.S. § 4321(2) (providing that parents are liable for the support of their children); 23 Pa.C.S. § 5102(a) [providing that children born out of wedlock shall enjoy all the rights and privileges as if they had been born during wedlock except *as is* otherwise provided in Title 20 (relating to decedents, estates and fiduciaries)]; *Branch v. Jackson,* 427 Pa.Super. 417, 629 A.2d 170 (1993).

13. 20 Pa.C.S. § 2107.

county in the Commonwealth. 23 Pa.C.S. § 1301(b). An application for a license is required, containing each applicant's: (1) name; (2) occupation; (3) place of birth; (4) place of residence; (5) statement that he/she is not afflicted with a transmissible disease; and (6) parents' name, residence, occupation and birthplace. 23 Pa.C.S. § 1302. In connection with the application, each applicant must appear for an examination under oath regarding such factors as the legality of the marriage and the existence of and dissolution of any prior marriages. 23 Pa.C.S. § 1306. Unless there is an emergency or extraordinary circumstances requiring court intervention, there is a three day waiting period for a marriage license following submission of the application. 23 Pa.C.S. § 1303. Once a license to marry is issued, the marriage can be solemnized by various persons, including judges, district justices, magistrates, mayors and clergy of any regularly established church or congregation. 23 Pa.C.S. § 1503. In the alternative, couples have the option of solemnizing their marriage themselves after obtaining certification that no legal impediment to marriage exits. 23 Pa.C.S. § 1502. Indeed, since couples may thus marry themselves, the only differences between this form of statutory marriage and that of common law are the requirement of witnesses and the licensing procedure.

In addition, imposing the rights and obligations attendant to marriage only upon those who have entered into their unions pursuant to these statutory procedures has many advantages. It provides a bright line standard to guide the courts in adjudicating disputes and the public in conducting and defining their relationships with some measure of certainty and stability. It furthers the beneficial provisions of the Marriage Law, and reduces both the need for litigation to settle rights and the opportunity for fraudulent claims.

As the Superior Court of Pennsylvania astutely observed in 1941:

> [T]here is widespread confusion among laymen generally, and to some extent among laymen in administrative boards and positions, as to what a common law marriage is. Influenced, perhaps, by the newspaper custom of referring to a man's mistress or paramour as his "common law wife", there is a general tendency to regard every case of a man and woman living together, without a ceremony of marriage performed by a church or state official, as a common law marriage, irrespective of whether the relation is lawful or illicit.

*Baker v. Mitchell,* 143 Pa.Super. 50, 17 A.2d 738, 741 (1941). *Accord McCoy,* 256 A.2d at 910. The fact that in today's world many couples choose to cohabit without any intention of being presently married only adds to the potential difficulties generated by a common lack of public understanding as to what separates a common law marriage from mere cohabitation.[14] Some persons may mistakenly believe they are common law spouses if they have lived with another for an extended period of time, particularly if they have children together. Others may assume that they can never be deemed married unless they have gone through the statutory formalities.

14. In *Staudenmayer,* Justice Newman noted that when dealing with the rebuttable presumption of common law marriage based upon cohabitation and reputation:

> [W]e question the utility of constant cohabitation as an element of that presumption. Cohabitation between unmarried people today does not carry with it the same social taboo as when the common law marriage doctrine was developed, and is perhaps less indicative of an intent by a man and a woman to be husband and wife than it was fifty or one hundred years ago.

552 Pa. at 265 n. 8, 714 A.2d at 1021 n. 8.

When their understanding is challenged by some dispute with their partners, third parties or government authorities, they may discover too late that they have foregone rights or undertaken responsibilities contrary to their intentions.

Even if those persons are assumed to know the law—and thus understand their own marital status—absent the record created by the formalization of a statutory marriage, innocent parties may easily be misled about their rights. For instance, it may be impossible for a man or woman entering into a marriage to discover that the prospective spouse has an undissolved common law marriage. Moreover, uncertainty as to marital status has a far greater detrimental impact on third parties today than when the doctrine was created. At that time, persons contemplating business transactions with couples relied predominantly, if not exclusively, upon the creditworthiness and earning capacity of the husband. Business relationships were rarely entered into with married women in their sole names. In twenty-first century commerce, third parties need and are entitled to know whether the men, women and couples with whom they contract are married or single, for that may significantly affect their rights. Statutory marriage provides a certain record if third parties chose to investigate; common law marriage may be impossible to ascertain or verify until some dispute brings about court proceedings.

Aside from the record it provides, demanding compliance with the requirements of the Marriage Law promotes its salutary purposes, notably screening of persons who are unable to marry because of some legal impediment, transmissible disease, mental incompetency or drug or alcohol impairment. This screening furthers important policies related to public health and welfare and is entirely absent when a couple embarks upon a marriage at common law.

Finally, the conclusion seems inescapable that recognizing as married only those who have duly recorded their union pursuant to the Marriage Law will greatly reduce the need for litigation to determine marital status. Even where litigation is necessary, it will obviate the need for intensive fact inquiries into the details of parties' relationships and greatly decrease the opportunity to present the sort of fraudulent and perjurious claims our Supreme Court, and others, have repeatedly lamented. In hearing cases such as this, we have been struck by the tendency of litigants in these matters to view common law marriage as something rather like a legal raincoat they can put on and take off as changing circumstances dictate. We see records in which couples have told one side of the family that they were married and the other side that they were not, depending upon what each collection of relatives might approve. Other couples may swear in applying for benefits that they are man and wife, but file tax returns averring under penalty of perjury that they are single. One attorney in oral argument, when asked how he could explain affidavits to the IRS inconsistent with the testimony of his client in the litigation then before the court, replied matter-of-factly that he assumed it lowered their tax liability. What is truly astonishing is not that parties take inconsistent positions to gain advantage, but that they seem to see nothing particularly inappropriate in their chameleon-like behavior. We must conclude that this court can no longer place its imprimatur on a rule which seems to be a breeding ground for such conduct and its attendant disrespect for the law itself.

As our Supreme Court noted in *Albert M. Greenfield & Co., Inc. v. Kolea,* 475 Pa. 351, 380 A.2d 758 (1977):

"Courts have a duty to reappraise old doctrines in the light of the facts and values of contemporary life particularly old common law doctrines which the courts themselves created and developed. As we have said before, '(T)he continued vitality of the common law ... depends upon its ability to reflect contemporary values and ethics.'" (Footnote omitted).

*Id.* at 357, 380 A.2d at 760, quoting *Javins v. First Nat'l Realty Corp.*, 138 U.S.App. D.C. 369, 428 F.2d 1071, 1074 (1970). This does not dispose of the matter, however, for two questions remain. The first is whether or not we, as an intermediate appellate court have the authority to decline to follow a common law rule which our Supreme Court has heretofore left in place. We have found no direct authority on the matter from the Pennsylvania Supreme Court, but the matter has been repeatedly considered by the federal courts. Ordinarily such a step would be considered improper. *See, e.g., de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989). However, many authorities have suggested that in an appropriate case "anticipatory overruling" may be not only permissible, but an obligation. *See* Margaret N. Kniffen, *Overruling Supreme Court Precedents: Anticipatory Action by United States Courts of Appeals*, 51 Fordham L.Rev. 53, 74–75 (1982); *United States v. Girouard*, 149 F.2d 760, 765 (1st Cir.1945) (Woodbury, J., dissenting), *rev'd*, 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084 (1946); *Spector Motor Serv., Inc. v. Walsh*, 139 F.2d 809, 823 (2d. Cir.1943) (Hand, J., dissenting), *vacated sub nom., Spector Motor Serv. v. McLaughlin*, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944). We believe

that the best view is that such action should be taken only in the extraordinary circumstance in which there can be no serious question as to our Supreme Court's intention. In other words, "the Supreme Court should retain the exclusive privilege of overruling its own decisions, save perhaps when opinions already delivered have created a near certainty that only the occasion is needed for pronouncement of the doom." *Salerno v. American League of Prof. Baseball Clubs*, 429 F.2d 1003, 1005 (2d. Cir.1970), *declined to follow on other grounds, Piazza v. Major League Baseball*, 831 F.Supp. 420 (E.D.Pa.1993). We believe this is just such a case. In *Staudenmayer* our Supreme Court, while declining to reach the issue, "has raised the overruling axe so high that its falling is just about as certain as the changing of the seasons." *Republic Steel v. Maddox*, 379 U.S. 650, 667, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965) (Black, J., dissenting). Accordingly henceforth, this court will recognize as valid only those Pennsylvania [15] marriages entered into pursuant to the Marriage Law procedures.

■ Finally, we must determine the scope of application of our ruling. As our Supreme Court has explained:

This Court has recognized four approaches to applying a decision announcing a new rule of law. *Blackwell v. Commonwealth, State Ethics Comm'n*, 527 Pa. 172, 589 A.2d 1094 (1991). Mr. Justice Zappala cogently explained these four approaches in his Concurring Opinion in *Blackwell* as follows:

The first approach, in which a new rule is not even applied to the parties to the case in which the rule is announced, may be described as giving the new rule "purely prospective ef-

---

**15.** We express no opinion concerning marriages entered into in other states and recognized in those jurisdictions as valid.

fect". The second approach, in which the new rule is applied to the parties to the case in which the rule is announced and litigation commenced thereafter, is best described, I believe, as giving the new rule "prospective effect".... The third approach, in which the new rule is applied to the case in which it is announced and all other cases then pending on direct review where the issue is raised, may be said to give the new rule "retroactive effect".... The fourth approach, in which the new rule is applied even where the issue has been finally decided at the time of the decision announcing the new rule but later is asserted in collateral proceedings, may be described as giving the new rule "fully retroactive effect".

*Id.* at 190–91, 589 A.2d at 1103.

*Cleveland v. Johns–Manville Corp.*, 547 Pa. 402, 409 n. 8, 690 A.2d 1146, 1150 n. 8 (1997), *declined to follow on other grounds*, *Norfolk & Western Railway Co. v. Ayers*, —— U.S. ——, 123 S.Ct. 1210, 155 L.Ed.2d 261 (2003). Neither the United States Constitution, nor the Pennsylvania Constitution, mandates or precludes a retroactive application of a new decision. *Id.* at 412, 690 A.2d at 1151. Although the general rule prefers retroactive (but not fully retroactive) application, it is a matter of judicial discretion to be exercised on a case by case basis. *Id.* at 413, 690 A.2d at 1151–52. When a decision announces a new principle of law:

> [C]onsider the following three factors to decide if the new rule should be applied retroactively or prospectively: (1) the purpose to be served by the new rule; (2) the extent of the reliance on the old rule; and (3) the effect on the administration of justice by the retroactive application of the new rule.

*Id.* at 414, 690 A.2d at 1152. *Kituskie v. Corbman*, 552 Pa. 275, 283 n. 5, 714 A.2d 1027, 1030 n. 5 (1998).

■ On balance, we believe these factors favor purely prospective application in this case. The benefits of the new rule will generally only be felt in the future no matter how it is applied. Persons can arrange their affairs only for the present and future; retroactive application will not cure mistakes made in the past based on misunderstanding of the old law. A clear rule will assist the courts only in deciding future cases; upsetting cases properly decided under the old law will aid neither the courts nor the litigants. Similarly, furthering the health and welfare policies of the Marriage Law and reducing the need for litigation can occur only in the future. In addition, the old rule was of such long-standing application that many have undoubtedly relied upon it, including the parties whose rights are now before the court. Finally, prospective application will give our Supreme Court an opportunity to review our holding, and minimize any disruption that might result should we have somehow misunderstood that body's intention.

■ Thus, we must turn to employer's alternative argument that Kretz failed to meet his burden of proof under the old law. Specifically, PNC argues that the WCJ erred in concluding that the common law spouse affidavit was sufficient to demonstrate the necessary *verba in praesenti*, the exchange of words in the present tense, spoken with the intent of creating the legal relationship of husband and wife. Employer contends that the affidavit is insufficient because it speaks to a past event rather than a present intent to marry. Employer also contends that the affidavit cannot be construed as a reaffirmation of their intent to marry. We disagree and conclude that the affidavit and Kretz's

testimony were sufficient to meet Kretz's burden of proof.

■ First, testimony regarding the mutual expressed intent to marry is always going to refer to a past event. Therefore, that the affidavit is written in the past tense does not undermine the finding that the couple had entered into a common law marriage. Indeed, if Kretz's testimony had exactly mirrored the affidavit, there would be no doubt that it would have been sufficient to meet his burden of proof regarding the requisite *verba in praesenti*. Second, Kretz's testimony regarding the manner in which the couple arrived at their date of marriage when signing the affidavit does not render the affidavit insufficient. The weight and credibility of Kretz's testimony were for the WCJ, and we cannot review his findings in that regard on appeal. We also conclude that the WCJ did not err in construing Kretz's testimony regarding the circumstances surrounding execution of the affidavit as well as the actual execution of the document itself as an independent exchange of words expressing the present intent to be husband and wife. Accordingly, we reject this assertion of error.[16]

Employer next asserts that the WCJ erred in relying on evidence of cohabitation and reputation in addition to the evidence of *verba in praesenti* to support her conclusion. According to employer, the WCJ erred in considering any evidence of reputation and cohabitation since Kretz was available to testify to the *verba in praesenti*. Employer also argues that the

evidence was insufficient to demonstrate a broad and general reputation of marriage.

■ Employer is correct that permitting a party to demonstrate a common law marriage through evidence of reputation and cohabitation is a rule of necessity that only applies when direct evidence regarding the exchange of *verba in praesenti* is unavailable or there is conflicting evidence of *verba in praesenti*. *Staudenmayer*, 552 Pa. at 263–65, 714 A.2d at 1021. Regarding the admission of evidence of cohabitation and reputation when parties are available to testify to the requisite exchange of words, the Supreme Court stated in *Staudenmayer*:

> By requiring proof of *verba in praesenti* where both parties are able to testify, we do not discount the relevance of evidence of constant cohabitation and reputation of marriage. When faced with contradictory testimony regarding *verba in praesenti*, the party claiming a common law marriage may introduce evidence of constant cohabitation and reputation of marriage in support of his or her claim. We merely hold that if a putative spouse who is able to testify and fails to prove, by clear and convincing evidence, the establishment of the marriage contract through the exchange of *verba in praesenti*, then that party has not met its "heavy" burden to prove a common law marriage, since he or she does not enjoy any presumption based on evidence of constant cohabitation and reputation of marriage.

*Id.* at 264–65, 714 A.2d at 1021 (footnote omitted). Thus, while evidence of cohabitation and reputation was irrelevant to a

---

16. We agree with employer that the Board erred in stating that a common law marriage must be demonstrated by substantial, competent evidence. *See Staudenmayer*, 552 Pa. at 264, 714 A.2d at 1021 (holding that where parties are available to testify to *verba in*

*praesenti*, party claiming a common law marriage must produce clear and convincing evidence of the requisite exchange of words). However, since the WCJ applied the correct burden of proof, the Board's error does not command a reversal.

determination of whether Kretz met his burden of proof, the admission of such evidence does not amount to reversible error because the WCJ found a common law marriage based upon the exchange of *verba in praesenti.* Furthermore, since Kretz testified to the exchange of *verba in praesenti,* his case rose and fell on the sufficiency of that testimony. Therefore, the sufficiency of the evidence of cohabitation and reputation is completely irrelevant and we will not review it to determine whether it supports a finding of common law marriage.

■ Employer also argues that the WCJ erred in failing to draw an adverse inference based upon Kretz's failure to present the testimony of Stamos's children regarding the marital status of their mother. In *Commonwealth v. Moore,* 453 Pa. 302, 309 A.2d 569 (1973), the Supreme Court articulated the missing witness rule as follows:

> Generally, when a potential witness is available to only one of the parties to a trial, and it appears this witness has special information material to the issue, and this person's testimony would not be merely cumulative, then if such party does not produce the testimony of this witness, the jury may draw an inference it would have been unfavorable. *See* McCormick, Law of Evidence, 534 (1954). *See also Bentivoglio v. Ralston,* 447 Pa. 24, 288 A.2d 745 (1972), and *Commonwealth v. Wright,* 444 Pa. 536, 282 A.2d 323 (1971).

*Id.* at 305, 309 A.2d at 570. It must be emphasized that the adverse inference is allowed only when the uncalled witness is peculiarly within the reach and knowledge of only one party. *Bennett v. Sakel,* 555 Pa. 560, 563–64, 725 A.2d 1195, 1196 (1999).

■ Here, employer contends that Stamos's children "would have been within the control of [Kretz] as members of his extended family, a situation giving [Kretz] access and influence with respect to their testimony, clearly within the ambit of the rule." Petitioner's appellate brief at 38. Employer does not contend, however, that it lacked knowledge of Stamos's children prior to the litigation or could not call them itself. Furthermore, there is no evidence that Stamos's children were peculiarly within the reach of Kretz only. Accordingly, we conclude no error occurred.[17]

■ Finally, employer argues that the WCJ committed reversible error by failing to make any factual findings regarding the testimony of John Heinlein, III, a witness offered by Kretz. According to employer, this failure is critical because Heinlein testified that Kretz and Stamos were not married ceremonially or at common law. Employer contends that the WCJ's failure to make such findings indicates she may have overlooked the testimony or misunderstood the "application of said testimony to the law." Employer also contends that the WCJ's failure resulted in an unreasonable decision in violation of Section 422(a) of the Workers' Compensation Act (Act), Act of June 2, 1915, P.L. 736, *as amended,* 77 P.S. § 834.[18] We disagree.

Notwithstanding the fact that we disagree with employer's characterization of

---

17. According to Kretz, both children were over the age of eighteen during the litigation.

18. Section 422(a) provides that parties are entitled to a reasoned decision, which contains findings of fact and conclusions of law based upon the evidence and explains the rationale for the decision so that one can understand how and why the particular result was reached. Section 422(a) also provides that when faced with conflicting evidence, the WCJ must adequately explain the reasons for accepting or rejecting competent evidence.

Heinlein's testimony, it is clear that the WCJ considered the testimony as she stated that, "After careful review of the testimony that has been offered in this matter by Mr. Kretz, *as well as the other witnesses,*[19] and a review of the various documents that have been offered, I find that the claimant, John Kretz, has established that a common law marriage did exist...." WCJ's opinion at 7 (emphasis and footnote added). This court has held that Section 422(a) of the Act does not require the WCJ to address all of the evidence before him/her. *Montgomery Tank Lines v. Workers' Comp. Appeal Bd. (Humphries)*, 792 A.2d 6, 13 n. 10 (Pa.Cmwlth. 2002). Rather, "the WCJ is only required to generally set forth the reasons for making the finding and is only required to make those findings necessary to resolve the issues that were raised by the evidence and which are relevant to making the decision." *Id.* Here, the WCJ set forth the evidence critical to her findings and such findings were all that was necessary to resolve the issue of whether a common law marriage had been proved. Accordingly, this contention is meritless.

Based upon the foregoing, the order of the Board is affirmed.

Judge SIMPSON concurs in the result only.

### ORDER

AND NOW, this 17th day of September, 2003, the order of the Workers' Compensation Appeal Board in the above captioned matter is hereby AFFIRMED.

DISSENTING AND CONCURRING OPINION BY Judge SMITH–RIBNER.

I respectfully dissent from the majority opinion because of my strong disagreement with a determination by an intermediate court of this Commonwealth that the right granted at common law to individuals to enter into common law marriage henceforth shall no longer exist. The majority usurps the function of the legislature and casts upon the people of this Commonwealth a change in common law that the majority has no authority or power to impose. When the people desire to abolish common law marriages, they should do so through their elected representatives in the legislature. The Supreme Court thought so in a situation involving the court's power to change the common law duty of a parent for the support of a minor child. The court felt that a "more prudent course" of action was to await guidance from the legislature rather than to create duties or obligations by judicial fiat. *Blue v. Blue*, 532 Pa. 521, 616 A.2d 628 (1992).

The majority reads dicta from *Staudenmayer v. Staudenmayer*, 552 Pa. 253, 714 A.2d 1016 (1998), as evidence that the Supreme Court would act to abolish common law marriages if only it had the right case before it and since the issue is now squarely before this Court that it should act instead. That logic is faulty for various reasons, the least of which is that only two members of the seven-member Supreme Court voted for the court to seize the opportunity in *Staudenmayer* to abolish common law marriages. A clear majority of the Supreme Court did not do so and perhaps for the very sound reason that it chose not to act in *Blue* to change duties or obligations established at common law or more recently in *Benson v. Patterson*, —— Pa. ——, 830 A.2d 966 (2003) (Newman, J. dissenting). The issue

---

**19.** There were only 3 witnesses in the case and the WCJ made specific findings regarding two of the witnesses—Kretz and Gillespie. If the WCJ had not reviewed Heinlein's testimony, she would not have used the plural form of the word witness in the phrase "as well as the other witnesses."

in *Benson* was whether the Supreme Court could extend a duty of support for two minor children upon the estate of the deceased father and to require the estate to pay outstanding support orders, as well as increases, to the respective mothers until the minor children reached the age of majority.

In rejecting the notion that it could extend a duty of child support beyond the father's death, the Supreme Court very clearly expressed its position:

> Under the Common Law, a parent had a duty to support a minor child. In its wisdom, our General Assembly has bestowed adulthood on minor children at age 18. Consequently, the common law duty to support a minor child must by necessity cease at age 18.... Accordingly, since no legal duty has been imposed by our legislature, nor have we developed such a duty by our case law, we decline to do so. Since our legislature has taken an active role in domestic matters through amendments and reenactment of the Divorce Code and the Domestic Relations Act, we feel the more prudent course is to await guidance from that body rather than creating duties and obligations by judicial pronouncement.

[*Blue,* 532 Pa. at 529, 616 A.2d at 632].

We apply the same reasoning to the case at bar. A child's needs do not end when a parent dies, but as sympathetic a fact as this may be, there are other considerations in the law, and it is clear we must defer to the legislature, which has taken an active role in developing the domestic relations law of Pennsylvania. *Garney* [*v. Estate of Hain,* 439 Pa.Super. 42, 653 A.2d 21 (1995)] was decided in 1995. *The General Assembly could have responded to the holding in Garney, (as it did in Blue), by amending the domestic relations and estate statutes; it has not done so, and it is not the role of the judiciary to legislate changes the legislature has declined to adopt.*

*Benson,* —— Pa. at ——, 830 A.2d at 968 (emphasis added).

The majority chronicles decisions from other jurisdictions, where common law marriage has been abolished, and it relies in part on a decision from the New Jersey Supreme Court in *Dacunzo v. Edgye,* 19 N.J. 443, 117 A.2d 508 (1955). The majority misses the point, however, of *Dacunzo:* the people of New Jersey abolished common law marriages through legislative action, not by judicial fiat from that state's Supreme Court or by intermediate court pronouncement. In *Staudenmayer* the Supreme Court expressly noted that it did not abolish common law marriages in Pennsylvania, and in *Brandywine Paperboard Mills v. Workers' Compensation Appeal Board (Zittle),* 751 A.2d 1205 (Pa. Cmwlth.2000), this Court cited *Staudenmayer* in recognition of the fact that common law marriage still exists in Pennsylvania.

In the matter of *Interest of Miller,* 301 Pa.Super. 511, 448 A.2d 25 (1982), the appellant requested the Superior Court to abolish common law marriage in Pennsylvania or to align the age of consent to that required for statutory marriage. The court declined the opportunity, as it had done before, to abolish common law marriage or to modify the doctrine, stating the following:

> Past efforts in the Legislature to abolish common law marriage have failed. Freedman, 1 Law of Marriage and Divorce in Pennsylvania, § 50a (2d ed.1957). The Marriage Law, Act of August 22, 1953, P.L. 1344, 48 P.S. § 1–23 [repealed by Section 6 of the Act of December 19, 1990, P.L. 1240, *see now* 23 Pa.C.S. § 1103] explicitly preserves

the right to contract a common law marriage, providing that "[n]othing herein shall be construed to change the existing law with regard to common law marriage." This remains the legislative intent, as may be seen from the fact that the Divorce Code of 1980 did not repeal this provision of The Marriage Law, although it did expressly repeal another provision. *See* Perlberger, Pennsylvania Divorce Code § 2.5 (1980). *For us to ignore so clear an expression of legislative intent would be an abuse of judicial power. If common law marriage is to be abolished, or the requirements for entering into it changed, it must be done by the Legislature, not the courts.* *Id.* 301 Pa.Super. 526, 448 A.2d at 32 (footnote omitted) (emphasis added).

That the majority of this Court has taken a position which is in complete and total contradiction of case law is pretty obvious. The Supreme Court declined an opportunity to change the common law as it relates to child support duties or obligations as requested in *Blue,* and in *Benson* the court declined the opportunity to change common law regarding the imposition of support obligations upon a decedent's estate because it was up to the legislature to do so rather than the court. The Superior Court in *Miller* declined a request to abolish common law marriage because that matter too was up to the legislature to determine rather than the court. There is no question that this Court should likewise decline PNC's request for it to abolish common law marriage, which has long been recognized in this Commonwealth.

If the Pennsylvania legislature determines in its wisdom, as have the legislatures in New Jersey or in Florida, *see* N.J.S. § 37:1–10, Fla. S. § 741.211, and many other jurisdictions, to take up the issue of abolishing common law marriage then at that time it may well consider and debate many of the policy considerations expressed by the majority here for doing what it has no authority or power to do. Otherwise, I concur with the majority's decision to affirm the grant of the fatal claim petition of John Kretz because he proved a common law marriage with the decedent Janet Stamos.

Judge PELLEGRINI joins in this dissenting and concurring opinion.