17563

Betty I. CAMPBELL, Appellant, v. Mrs. Cornelia Campbell CHRIS-
TIAN, Mrs. Myrtis Campbell Williams, Mrs. Beulah Poole
Campbell, James W. Campbell, Jr., Rowark Campbell, Claude
Campbell, Hazel Campbell Clarke, Wayne Campbell, Sammie W.
Campbell and Van Campbell and Mary Ellen Campbell, Both
infants over 14 years of age, Respondents.

(110 S. E. (2d) 1)

*W. Harper Welborn,* Esq., of Anderson, *for Appellant,*

*Messrs. E. Harry Agnew* and *S. Eugene Haley,* of Anderson, *for Respondents,* and *Paul K. Rogers,* of Anderson, *Guardian Ad Litem for infant respondents,*

*Messrs. Hood & Hood,* of Anderson, *for Respondent,* Mrs. *Cornelia Campbell Christian,*

August 6, 1959.

LEGGE, Justice.

James Woodrow Campbell, a resident of Anderson County, died on February 25, 1956. His will dated September 9, 1947 was offered for probate in the Probate Court for that county and was there contested by the appellant, Betty I. Campbell, upon the ground that it had been revoked by her marriage with Campbell on July 17, 1954. The Judge of that court admitted it to probate and held that the said marriage was invalid because the respondent Beulah Poole Campbell was then decedent's common-law wife. Appeal was heard, by consent, before the Honorable J. B. Pruitt, Judge of the Tenth Circuit, upon the transcript of the Probate Court record; and from his decree of January 30, 1959, affirming the decree of the Probate Court, comes this appeal.

The case is at law, *Harris v. Berry,* 231 S. C. 201, 98 S. E. (2d) 251, and the single issue is one of fact, to wit: Were James Woodrow Campbell and Beulah Poole Campbell husband and wife on July 17, 1954? Our review of the circuit decree is limited to determination of whether or not there was any evidence to support it. *Phillips*

*v. DuBose,* 223 S. C. 224, 75 S. E. (2d) 56; *Seagle v. Montgomery,* 227 S. C. 436, 88 S. E. (2d) 357.

Campbell was born on January 12, 1875, and was eighty-one years old at the time of his death in February, 1956. In February, 1894, when he was nineteen, his first child, Myrtis, was born to Emma Hickman, whom he never married. It should be said, in passing, that he supported Myrtis thereafter until her marriage in 1918, and that by his will, after provision for nine cash legacies aggregating $2,525.00, he left his residuary estate to her and his daughter Cornelia in equal shares and appointed both of them as executrices.

At some time prior to February, 1921, Campbell married Mattie Grey. They had no children.

While married to Mattie, Campbell had illicit relation with Beulah Poole, an illiterate, ignorant girl; and on November 18, 1921, she bore him a child. He was then forty-five, she fourteen.

On January 11, 1923, Mattie having died, Campbell married her niece, Gertrude. One child, Cornelia, was born to them on November 16, 1923. During this marriage, Campbell's relations with Beulah continued, with the result that she had two more children by him, one on January 28, 1925, the other on January 18, 1928. On December 10, 1927, he divorced Gertrude in a Florida proceeding, the validity of which is not in issue.

About a year after the divorce, Beulah came into his home and took the name of Campbell, and they lived together for more than twenty-four years, during which five children were born to them, one in 1931, one in 1932, one in 1935, one in 1938, and one in 1943. In the spring of 1954 he deserted her and moved to another house in the city of Anderson.

Shortly thereafter the appellant, who had been living in Georgia, came to Anderson. In response to a newspaper advertisement she entered Campbell's employ as cook and housekeeper, and on June 10, 1954, they executed a written

contract to that effect, which, after reciting her agreement, in considration of $15.00 per week and board and lodging, "to cook for J. Woodrow Campbell, keep his house clean, and attend to the washing and other household duties", proclaimed that "she will occupy a separate room and she will be known as an employee of J. Woodrow Campbell", and that "the relationship of employee and employer will be and is the only relationship which will exist between the parties thereto." On July 17, 1954, they drove across the Georgia line and the Ordinary of Hart County performed a ceremony purporting to unite them in holy wedlock. He was then seventy-nine, she forty-two.

There is in the record before us considerable evidence that from the time that Campbell took Beulah into his home, a year or so after his divorce from Gertrude, he and she lived together as husband and wife, and that they were so recognized in the community. An elderly neighbor, who had known Campbell throughout the latter's life, testified that "they lived openly as husband and wife"; that "he carried the children around with him and they went by the name of Campbell and went to school under the name of Campbell"; and that the general public considered them as man and wife. One of Campbell's sons testified, without objection, that when strangers came to the house Campbell, after introducing himself, would introduce Beaulah as his wife. His daughter Myrtis testified that during the many years that Campbell and Beaulah lived together she visited in their home and understood that they were married; and that the people of the community knew them as man and wife.

In evidence are the birth certificates of five of the children, from which we note the following:

1. That of the child born November 18, 1921, names Beulah Poole as its mother, does not name its father, and states that the child's parents were not married.

2. That of the child born January 28, 1925, names James Woodrow Campbell as its father and Beaulah Poole as its mother, and states that the child's parents were not married.

3. That of the child born January 18, 1928, names the parents as Woodrow Campbell and Beulah Campbell, and states that they are married.

4. That of the child born June 8, 1935, names the parents as Woodrow Campbell and Beulah Campbell, and states that they are married.

5. That of the child born July 3, 1943, names the parents as James Woodrow Campbell and Beulah Poole, and states that they are married.

Appellant, contending that Beulah's own testimony shows the relationship between her and Campbell to have been that of concubinage, not common-law marriage, points to the following portions of it:

"Q. You hadn't had any signed contract or anything at that time that you were his wife, did you? A. No.

"Q. And he never did tell you that you were his wife, did he? A. I had sense enough to know that I didn't marry him.

"Q. Both of you were not married then, were you? A. No, we weren't married.

\* \* \*

"Q. Did you ever try to get him to take you to the preacher? A. No, we talked about it but we never did get to it.

"Q. Did you try to get him to? A. No, I did not. I wasn't going to beg him. If he didn't want to marry me, I wasn't going to beg him."

\* \* \*

"Q. You don't think you had any right to take out a warrant against him for marrying Betty? A. No, I didn't think that I did.

"Q. That was because you didn't consider you and he were married? A. That is right."

\* \* \*

"Q. Did you and he ever go to church together? A. No, sir, he went to church sometimes and carried the children.

"Q. He didn't take you? A. I didn't go.

"Q. Did you want to go? A. Yes, sir, I would like to have gone some, but I didn't get to.

"Q. And that is because you were uncertain about your relationship to him, weren't you? A. Yes, sir."

Throughout the record of this case Beulah appears as a woman illiterate, uneducated, and of childlike simplicity. It is not improbable that when she made the statements above quoted she was thinking of a ceremonial, rather than actual, marriage. Nor is it improbable that she, like many others whose intellectual and social horizons are thus limited, had the notion that a marriage is not legal unless solemnized by a religious, or at least an official, ceremony. The trial judge did not discuss her testimony, and therefore we cannot say with certainty how he construed her statements as to nonmarriage; if he viewed them as referring to ceremonial marriage we could not condemn such inference as unreasonable. But whether he so viewed them or not, we do not think that they are conclusive of the issue. Against them stands evidence that after Campbell's divorce the relationship between him and Beulah, which theretofore had been illicit, underwent a fundamental change; that whereas before it they had lived separately, after it they resided together, openly and continuously, over a period of at least twenty-four years, during which they were known and recognized in the community as husband and wife; and that the children born to them during this cohabitation were declared to the public authorities charged with the duty of registering their births, as having been born in wedlock. In short, they are contradicted by the conduct and general repute of both parties over a period of many years.

"Assertions of both parties that their relation was one of open concubinage, or admission of nonmarriage by one party, fortified by strong circumstances, may suffice to overcome the presumption of their marriage from cohabitation and reputation. Such an admission by the parties does not suffice to overcome the presumption, however, where it is shown that the admission may well have been made with

reference to a ceremonial marriage, and not uttered with the idea of negativing broadly the existence of the marital status." 35 Am. Jur., Marriage, Par. 214, p. 320; *Adger v. Ackerman,* 8 Cir., 115 F. 124; Annotation: L. R. A. 1915E, at pages 75 and 76.

Illicit relationship, though accompanied by cohabitation, is not transformed into the legal state of marriage by mere lapse of time. But mutual recognition of the marriage relation, at a time when the parties are able to enter into the marital contract, has long been accepted as ground for upholding the marriage. Where the evidence is in conflict, determination of the issue is for the trier of the facts. *Allen v. Hall,* 2 Nott & McC. 114, 11 S. C. L. 114, 10 Am. Dec. 578; *Jewell v. Magwood,* Rich. Eq. Cas. 113, 9 S. C. Eq. 113; *State v. Whaley,* 10 S. C. 500; *Howell v. Littlefield,* 211 S. C. 462, 46 S. E. (2d) 47.

In the case at bar there was ample evidence, to which we have already referred, to support the conclusion that after the barrier to their marriage had been removed by Campbell's divorce from Gertrude, he and Beulah entered into a new mutual agreement whereby their previously illicit relationship was terminated and a valid common-law marriage established. That Campbell some twenty-five years thereafter declared, in his application for a license to marry Betty, that he was not married, is of no legal consequence; for once his marriage to Beulah became complete, as the trial judge held it to be, no act or disavowal of it on his part could invalidate it. *Jewell v. Magwood, supra.*

By one of her exceptions, appellant charges that the lower court erred in holding all of the children of Campbell and Beulah legitimate. No question is made as to the court's authority to adjudicate this issue on appeal in a proceeding for probate in due form of law; the parties apparently consented that it should do so. The contention here is that the issue was incorrectly decided because two of the children were born, and one was conceived, while Campbell was married to Gertrude.

Actually, adjudication that appellant's marriage to Campbell was invalid has foreclosed whatever remediable interest she may have had with respect to the legitimacy of Beulah's children. But, aside from that, we think that the trial judge decided the issue correctly. He did not undertake to determine the exact date on which the marriage between Campbell and Beulah was established; it is rarely possible to fix precisely the time at which a common-law marriage may be said to have come into being. *Rodgers v. Herron*, 226 S. C. 317, 85 S. E. (2d) 104, 48 A. L. R. (2d) 1241. But it is clear from the evidence that it was entered into within a year or so after Campbell's divorce, which had been obtained on December 10, 1927. It would seem, then, that their illegitimate children living on May 2, 1951 became legitimate upon the approval that day of the Act of the General Assembly (47 Stat. at Large 265) now Section 20-5.1 of the 1952 Code.

Affirmed.

STUKES, C. J., and TAYLOR, OXNER and MOSS, JJ., concur.