# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

A. Marion Stone, III, Respondent,

v.

Susan B. Thompson, Petitioner.

Appellate Case No. 2017-000227

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Charleston County
Jocelyn B. Cate, Family Court Judge

---

Opinion No. 27908
Heard June 13, 2019 – Filed July 24, 2019

---

## REVERSED

---

Donald Bruce Clark, of Donald B. Clark, LLC, of
Charleston, for Petitioner.

Alexander Blair Cash and Daniel Francis Blanchard, III,
both of Rosen Rosen & Hagood, LLC, of Charleston, for
Respondent.

---

**JUSTICE HEARN:** This case initially came to the Court to consider whether an
order from a bifurcated hearing determining the existence of a common-law
marriage was immediately appealable. In *Stone v. Thompson*, 426 S.C. 291, 826

S.E.2d 868 (2019), we held it was and retained jurisdiction to consider the merits. We must now determine whether the family court was correct in finding Susan Thompson and Marion Stone were common-law married in 1989, as well as whether Stone was entitled to an award of attorney's fees.

Our review in this case has prompted us to take stock of common-law marriage as a whole in South Carolina. We have concluded the institution's foundations have eroded with the passage of time, and the outcomes it produces are unpredictable and often convoluted. Accordingly, we believe the time has come to join the overwhelming national trend and abolish it. Therefore, from this date forward—that is, purely prospectively—parties may no longer enter into a valid marriage in South Carolina without a license. Consistent with our findings regarding the modern applicability of common-law marriage rationales, we also take this opportunity to refine the test courts are to employ henceforth.

Nevertheless, the case before us remains. We do not believe Stone demonstrated the mutual assent required to prove a common-law marriage, and as a result, we hold the parties were not married and reverse the family court on the merits and as to the issue of attorney's fees.[1]

# I.

a. *Historical Common-law Marriage*

The institution of common-law marriage traces its roots to informal marriage in Europe prior to the Reformation. Cynthia Grant Bowman, *A Feminist Proposal*

---

[1] This Court has had jurisdiction of this case since 2018 when the issue of the appealability of the order finding a common-law marriage was briefed, orally argued, and ruled upon. After finding the matter was appealable, we maintained jurisdiction in the interest of judicial economy, and the parties briefed and orally argued the merits of the case. Unbeknownst to this Court, a mediation was apparently conducted subsequent to oral argument, and while an opinion was in circulation, this Court was advised by Stone's counsel that a mediated agreement had been reached. Stone's counsel requested that the appeal be dismissed and that the case be remanded to the family court for approval of the agreement. We issued an order directing the family court not to take any action while this case was pending, and thereafter, counsel for Thompson requested we deny the motion to remand and decide the case on its merits. Accordingly, we deny the motion to remand and resolve the case that was fully briefed and argued to us.

*to Bring Back Common Law Marriage*, 75 OR. L. REV. 709, 718 (1996); *see also* Ashley Hedgecock, Comment, *Untying The Knot: The Propriety of South Carolina's Recognition of Common Law Marriage*, 58 S.C. L. REV. 555, 559-62 (2007). England recognized such unions during colonization, and as a result, common-law marriage migrated to the New World. Bowman, *supra*, at 719. Some states proceeded to adopt the doctrine, while others did not. *Id*. at 719-22. A primary reason for those that did was logistical—frontier America was sparsely populated and difficult to travel, making access to officials or ministers impractical for many. *Id*. at 722-24. States also sought to legitimize "subversive" relationships and the children thereof, as well as to direct women to the family for financial support instead of the public fisc. Hedgecock, *supra*, at 560; *see also* Ariela R. Dubler, *Wifely Behavior: A Legal History of Acting Married*, 100 COLUM. L. REV. 957, 968-69 (2000).

South Carolina followed New York's approach in adopting common-law marriage, holding it was a matter of civil contract that did not require ceremony; rather, two people were married when they agreed and intended to be. *Fryer v. Fryer*, 9 S.C. Eq. (Rich. Cas.) 85, 92 (1832); *Fenton v. Reed*, 4 Johns. 52 (N.Y. Sup. Ct. 1809). As Justice Littlejohn explained in 1970, the institution sought to "legitimatize innocent children and adjust property rights between the parties who treated each other the same as husband and wife." *Jeanes v. Jeanes*, 255 S.C. 161, 168-69, 177 S.E.2d 537, 540-41 (1970) (Littlejohn, J. concurring). Common-law marriage in South Carolina rests upon moral paternalism, as our courts have long recognized. *Id*. at 166-67, 177 S.E.2d at 539 ("The law presumes morality, and not immorality; marriage, and not concubinage; legitimacy, and not bastardy." (quotation omitted)). While our legislature has not expressly codified common-law marriage, it has recognized the institution by exception to the general requirement to obtain a marriage license. S.C. Code Ann. § 20-1-360 (2014).

b. *The Modern Trend*

The prevailing trend, however, has been repudiation of the doctrine. The reasons have been myriad—from economic to social—including some more nefarious than others. Bowman, *supra*, at 731-49. Alabama became the most recent state to do so, enacting Ala. Code 1975 § 30-1-20 in 2016. *See Blalock v. Sutphin*,

__ So. 3d __, 2018 WL 5306884 at *5 (Ala. 2018).  By our count, this leaves fewer than ten jurisdictions that currently recognize the institution.[2]

In 2003, the Pennsylvania Commonwealth Court set forth a thorough explanation for its conclusion that common-law marriage should no longer be recognized in *PNC Bank Corp. v. W.C.A.B. (Stamos)*, 831 A.2d 1269 (Pa. Commw. Ct. 2003).[3]  Notably, the court determined:

> The circumstances creating a need for the doctrine are not present in today's society.  A woman without dependent children is no longer thought to pose a danger of burdening the state with her support and maintenance simply because she is single, and the right of a single parent to obtain child support is no longer dependent upon his or her marital status.  Similarly, the marital status of parents no longer determines the inheritance rights of their children.  Access to both civil and religious authorities for a ceremonial marriage is readily available in even the most rural areas of the Commonwealth.  The cost is minimal, and the process simple and relatively expedient.

831 A.2d at 1279 (internal citations omitted).  The court also pointed to benefits of standardized formal marriage requirements such as predictability, judicial economy, and upholding the statutes' "salutary" purposes.  *Id*. at 1279-81.

---

[2] Our legislature has attempted to remove South Carolina from the ranks of recognizing states on many occasions, to no avail.  *See, e.g.*, H.B. 3925, 122nd Gen. Assemb., 1st Reg. Sess. (S.C. 2017); S.B. 11, 120th Gen. Assemb., 1st Reg. Sess. (S.C. 2013); H.B. 3588, 116th Gen. Assemb., 1st Reg. Sess. (S.C. 2005); H.B. 4597, 115th Gen. Assemb., 1st Reg. Sess. (S.C. 2004); H.B. 3625, 115th Gen. Assemb., 1st Reg. Sess. (S.C. 2003); H.B. 3774, 114th Gen. Assemb., 1st Reg. Sess. (S.C. 2001); H.B. 3452, 114th Gen. Assemb., 1st Reg. Sess. (S.C. 2001); H.B. 3668, 113th Gen. Assemb., 1st Reg. Sess. (S.C. 1999); H.B. 3656, 113th Gen. Assemb., 1st Reg. Sess. (S.C. 1999); H.B. 4410, 112th Gen. Assemb., 1st Reg. Sess. (S.C. 1998).

[3] Pennsylvania's Commonwealth Court—one of two intermediate appellate courts—held that common-law marriage was abolished in the state. Pennsylvania's legislature subsequently agreed, enacting a statute affixing January 1, 2005, as the final day on which a valid common-law marriage could be contracted.  23 PA. CONS. STAT. ANN. § 1103 (West 2005).

c. *Modern South Carolina*

The common law changes when necessary to serve the needs of the people. *Russo v. Sutton*, 310 S.C. 200, 204, 422 S.E.2d 750, 753 (1992). We will act when it has become apparent that the public policy of the State is offended by outdated rules of law. *Id*. (abolishing the "heart balm" tort of alienation of affections); *see also Nelson v. Concrete Supply Co.,* 303 S.C. 243, 399 S.E.2d 783 (1991) (abolishing contributory negligence); *McCall v. Batson,* 285 S.C. 243, 329 S.E.2d 741 (1985) (abolishing sovereign immunity). As discussed—and perhaps intuitively—common-law marriage's origins lie in the common law, and consequently, it may be removed by common-law mandate, regardless of tacit recognition by our legislature. *Russo*, 310 S.C. at 204, 422 S.E.2d at 753.

We find the Pennsylvania court's reasoning and other considerations sufficiently persuasive to adopt a bright-line rule requiring those who wish to be married in South Carolina to obtain a lawful license. Our law contains similar provisions regarding child support, inheritance, and the ceremonial marriage process. *See* S.C. Code Ann. §§ 20-1-210 to -240 (1976); §§ 62-2-101 to -109 (1976 & Supp. 2018); § 63-5-20 (1976 & Supp. 2018). The paternalistic motivations underlying common-law marriage no longer outweigh the offenses to public policy the doctrine engenders. By and large, society no longer conditions acceptance upon marital status or legitimacy of children. The current case is emblematic of this shift, as the parties' community of friends was wholly unconcerned with their marital status, and indeed several of their witnesses were in similar relationships. Meanwhile, courts struggle mightily to determine if and when parties expressed the requisite intent to be married, which is entirely understandable given its subjective and circumstantial nature. The solemn institution of marriage is thereby reduced to a guessing game with significant ramifications for the individuals involved, as well as any third party dealing with them.

Critically, non-marital cohabitation is exceedingly common and continues to increase among Americans of all age groups.[4] The right to marry is a fundamental constitutional right, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2604-05 (2015), which leads us to believe the right to remain unmarried is equally weighty, particularly when combined with our admonitions that a person cannot enter into such a union

---

[4] Renee Stepler, *Number of U.S. adults cohabitating with a partner continue to rise, especially among those 50 and older*, Pew Research Ctr. (Apr. 6, 2017), https://www.pewresearch.org/fact-tank/2017/04/06/number-of-u-s-adults-cohabiting-with-a-partner-continues-to-rise-especially-among-those-50-and-older/.

accidentally or unwittingly, *Callen v. Callen*, 365 S.C. 618, 626, 620 S.E.2d 59, 63 (2005). Further, we must agree with the many observers who have noted that common-law marriage requirements are a mystery to most.[5] The present case is again illustrative. None of the multiple witnesses who were asked understood what was required to constitute a common-law marriage, despite the fact that, as mentioned, several were involved in lengthy cohabitating relationships themselves. Moreover, two of such partners testified in complete opposition to one another, with one reporting they were common-law married, and the other stating emphatically they were not. This further persuades us to reject a mechanism which imposes marital bonds upon an ever-growing number of people who do not even understand its triggers.

Our public policy is to promote predictable, just outcomes for all parties involved in these disputes, as well as to emphasize the sanctity of marital union. We can discern no more efficacious way to fulfill these interests than to require those who wish to be married in our State to comply with our statutory requirements. Our quest to see inside the minds of litigants asserting different motivations and levels of knowledge at varying times must yield to the most reliable measurement of marital intent: a valid marriage certificate.

d. *Prospective Application*

The states that have abolished common-law marriage have consistently done so prospectively. However, many have utilized the legislative avenue, and as this Court pointed out in *Russo*, "the legislature cannot create a statute which applies retroactively to divest vested rights." 310 S.C. at 205 n.5, 422 S.E.2d at 753. This Court can choose to retroactively apply a judicial change to the common law, although we did not in *Russo*. *Id*.

The Pennsylvania Commonwealth Court in *Stamos* also elected to apply its decision purely prospectively. 831 A.2d at 1282-83. The court weighed the purpose of its new rule, the level of reliance on the old rule, and the impact on judicial function by retroactive application. *Id*. at 1283. The Pennsylvania court noted the benefits of the new rule should not undermine relationships which were validly entered into at the time, and upending formerly-correct decisions of law served the interests of no one. The court also concluded the old rule had been in effect for such

---

[5] *See* Bowman, *supra*, at 711 & n.6 (discussing the widely-held belief that cohabitation for seven years resulted in legal marriage).

a length of time that citizens undoubtedly relied upon it, including the parties before the court. *Id*.

We likewise decline to exercise our prerogative to apply our ruling today retroactively. We see no benefit to undoing numerous marriages which heretofore were considered valid in our State, and we will not foreclose relief to individuals who relied on the doctrine. Accordingly, our ruling today is to be applied purely prospectively; no individual may enter into a common-law marriage in South Carolina after the date of this opinion.

e. *Refining the Test*

Consistent with our observations regarding the institution's validity in modern times, we believe we must update the standards courts are to apply in future common-law marriage litigation. A common-law marriage is formed when the parties contract to be married, either expressly or impliedly by circumstance. *Callen*, 365 S.C. at 624, 620 S.E.2d at 62. The key element in discerning whether parties are common-law married is mutual assent: each party must intend to be married to the other and understand the other's intent. *Id*. Some factors to which courts have looked to discern the parties' intent include tax returns, documents filed under penalty of perjury, introductions in public, contracts, and checking accounts.[6]

Appellate courts have previously recognized two lines of cases regarding common-law marriage. *See Tarnowski v. Lieberman*, 348 S.C. 616, 620, 560 S.E.2d 438, 440 (Ct. App. 2002); *Barker*, 330 S.C. at 366-67, 499 S.E.2d at 506-07. The first holds that a party proves a common-law marriage by a preponderance of the evidence.[7] *Tarnowski*, 348 S.C. at 620, 560 S.E.2d at 440. The second relies on "a strong presumption in favor of marriage by cohabitation, apparently matrimonial, coupled with social acceptance over a long period of time." *Barker*, 330 S.C. at 367, 499 S.E.2d at 506. This presumption—like common-law marriage itself—is based on a conception of morality and favors marriage over concubinage and legitimacy

---

[6] *Kirby v. Kirby*, 270 S.C. 137, 142, 241 S.E.2d 415, 417 (1978); *Cathcart v. Cathcart*, 307 S.C. 322, 414 S.E.2d 811 (Ct. App. 1992); *Barker v. Baker*, 330 S.C. 361, 364, 366, 499 S.E.2d 503, 505-06 (Ct. App. 1998); *Owens v. Owens*, 320 S.C. 543, 546, 466 S.E.2d 373, 375 (Ct. App. 1996).

[7] In probate matters, however, a party alleging a common-law marriage must carry his burden by clear and convincing evidence. S.C. Code Ann. § 62-2-802(b)(4) (2009).

over bastardy. *Jeanes*, 255 S.C. at 166-67, 177 S.E.2d at 539-40. It can only be overcome by "strong, cogent, satisfactory or conclusive evidence" showing the parties are not married. *Id*. at 167, 177 S.E.2d at 540. This Court has held that once a common-law marriage becomes complete, "no act or disavowal" can invalidate it. *Campbell v. Christian*, 235 S.C. 102, 109, 110 S.E.2d 1, 5 (1959).[8]

Thompson argues the rebuttable presumption of common-law marriage is based on outdated assumptions about cohabitation. Given our foregoing assessment of common-law marriage, it will come as no surprise that we agree. The concerns regarding immorality, illegitimacy, and bastardy are no longer stigmatized by society, and as a result, they can no longer serve as the basis for assuming individuals are married.

Additionally, consistent with our preceding discussion regarding the sanctity of a marital relationship and our reticence to impose one on those who did not fully intend it, we believe a heightened burden of proof is warranted. Therefore, we hold the "clear and convincing evidence" standard utilized in probate matters should also apply to living litigants.[9] This is an intermediate standard—more than a preponderance, but less than beyond a reasonable doubt—and requires a party to show a degree of proof sufficient to produce a firm belief in the allegations sought to be established. *In re Estate of Duffy*, 392 S.C. 41, 46, 707 S.E.2d 447, 450 (Ct. App. 2011).

Finally, to the extent necessary, we clarify a section of this Court's opinion in *Callen*. 365 S.C. at 626, 620 S.E.2d at 63. A party is not required to show his opponent had legal knowledge of common-law marriage; ignorance of the law remains no excuse. He must demonstrate that both he and his partner mutually intended to be married to one another, regardless of whether they knew their resident state recognized common-law marriage or what was required to constitute one.

To sum up, in the cases litigated hereafter, a party asserting a common-law marriage is required to demonstrate mutual assent to be married by clear and convincing evidence. Courts may continue to weigh the same circumstantial factors traditionally considered, but they may not indulge in presumptions based on

---

[8] The preceding law is that which was in effect when Stone filed this case.

[9] We join other jurisdictions in adopting this standard for non-probate common-law marriage disputes. *See Staudenmayer v. Staudenmayer*, 714 A.2d 1016, 1021 (Pa. 1998).

cohabitation, no matter how apparently matrimonial. While we have set forth the law to be applied in future litigation, we apply the principles in effect at the time this action was filed to the case at hand.

## II.

a. *Factual and Procedural Background*

Stone and Thompson met in the early 1980's and began a romantic relationship shortly thereafter. Thompson was married to another man at the time and obtained a divorce from him in 1987. Later that year, Stone and Thompson had their first child. After Hurricane Hugo hit Charleston in 1989, the parties had their second child and started living together. They continued to live, raise their children, and manage rental properties together for approximately twenty years. Thompson worked as a veterinarian and owned multiple practices, while Stone performed contracting work and collected rent from tenants. The parties ultimately ended their relationship after Thompson discovered Stone was having an affair with a woman in Costa Rica.

In 2012, Stone filed an amended complaint in family court seeking a declaratory judgment that the parties were common-law married, a divorce, and an equitable distribution of alleged marital property. Thompson answered, asserting the parties were never common-law married and seeking dismissal. She also asked the court to bifurcate the issues to first determine if a common-law marriage existed if it would not dismiss the case. After a hearing, the family court denied Thompson's motion to dismiss but granted her motion to bifurcate, ordering a trial on the sole issue of whether the parties were married at common law.

The trial involved more than a week of proceedings, testimony from over 40 witnesses, and nearly 200 exhibits. Stone's testimony focused on the parties' cohabitation for approximately twenty years, the fact that they raised their two children together during this time, and their partnership in acquiring, renovating, and renting multiple properties in the Charleston area. He submitted evidence that the parties were jointly titled on real estate, boats, bank accounts, and credit cards, as well as that Thompson had listed herself as married to him on several documents from 2005-2008, including some prescribing criminal penalties for false statements. Stone's witnesses generally testified that the parties were assumed to be married in the community and were introduced as husband and wife by themselves and others on multiple occasions without correction.

Conversely, Thompson testified she never intended to marry Stone and went to great lengths to preserve her unmarried status. She pointed to numerous documents listing both her and Stone as single during the relevant time period, including all of their tax returns, his documents related to a Costa Rican financial venture, and a 2008 agreement signed by both parties. Thompson's witnesses reported that they and others in the community knew she and Stone were not married and they never heard them introduced as such. Several testified Thompson had told them she would never marry again.

The family court concluded the parties were common-law married beginning in 1989 when they began to live together full-time and Thompson introduced Stone as her husband during an art opening. The court found Stone's testimony credible while rejecting Thompson's versions of events on credibility grounds, as it determined Stone's witnesses were longtime friends of both parties and were distressed at having to testify, while many of Thompson's witnesses did not become close to her until after the affair. The family court concluded that Stone presented sufficient evidence of the parties' apparently-matrimonial cohabitation to trigger a presumption of marriage that could only be refuted by strong, cogent evidence they never agreed to marry. The court found Thompson failed to submit such evidence, as once she expressed the intention to be married in December 1989, no subsequent act could change it, as there is no common-law divorce. The family court awarded $125,620.32 in attorney's fees and costs to Stone, reasoning that Thompson's actions and denial of a common-law marriage were "flatly contradicted time and again . . . ."

Thompson appealed to the court of appeals, which determined the family court's order was not final and appealable because it did not end the case. *Stone v. Thompson*, 418 S.C. 599, 795 S.E.2d 49 (Ct. App. 2016). Thompson petitioned for a writ of certiorari, which this Court granted. We issued an opinion on April 3, 2019, finding the order was appealable. *Stone*, 426 S.C. 291, 826 S.E.2d 868.

b. *Standard of Review*

Appellate courts review family court matters de novo, with the exceptions of evidentiary and procedural rulings. *Stoney v. Stoney*, 422 S.C. 593, 813 S.E.2d 486 (2018) (citing *Lewis v. Lewis*, 392 S.C. 381, 709 S.E.2d 650 (2011)). Even under de novo review, the longstanding principles that trial judges are in superior positions to assess witness credibility and that appellants must show the trial judge erred by ruling against the preponderance of the evidence remain applicable. *Stoney*, 422 S.C. at 595, 813 S.E.2d at 487. Likewise, this Court reviews a family court's award

of attorney's fees de novo. *Chisholm v. Chisholm*, 396 S.C. 507, 510, 722 S.E.2d 222, 224 (2012).

c. *Analysis*

Thompson asserts the record reflects she never intended to be married to Stone. Stone contends the family court correctly found the parties were common-law married in 1989 because the record demonstrates the parties held themselves out and signed multiple documents under threat of criminal penalties as such during the course of their relationship.

The family court found the parties were married in 1989 after they moved in together, had their second child, and held themselves out as a married couple, as this established the requisite meeting of the minds. We disagree. Stone testified Thompson introduced him as her husband to a third party at an art opening around Christmas 1989, but Thompson stated this did not occur. Stone did not produce the third party to confirm that it did, and even respecting the court's credibility finding, we do not believe this rises to a preponderance of the evidence that, at that time, the two intended to be married and knew the other did as well.

Further, no evidence from the subsequent decade and a half demonstrated mutual intent to be married. Even assuming Stone intended to be married to Thompson throughout this time—which the evidence presented does not fully support—the critical inquiry is whether Thompson ever did. The parties continued to live and raise children together—consistent with their agreement to participate in a committed relationship—as well as run their business partnership of purchasing, flipping, and/or managing properties. Although some witnesses testified the two introduced each other as husband and wife, others testified they never heard them do so, and still others testified they knew not to because Thompson had told them they were not married. While acknowledging the family court's credibility determination, we nonetheless disagree with the court's view of the evidence. The court's finding that Thompson's witnesses largely became close to her after the affair is contradicted by fourteen witnesses who were acquainted with her and Stone during the relevant time period and testified they knew the parties were not married, while Stone's merely assumed they were. Significantly, there were no documents from 1989-2004 in which Thompson indicated she was married, and many that reflected she was not. Moreover, the children's birth certificates stated their last name was Thompson. While the children were born shortly before 1989, their legal last name remained Thompson until June 2000, when it was changed to Thompson Stone.

Even if a rebuttable presumption the parties were married arose, Thompson refuted it by strong, cogent evidence.

The evidence presented as to the factors appellate courts consider in determining intent was decidedly mixed. For example, Thompson insisted on filing her taxes as "single head of household" during the entirety of her relationship with Stone. *Kirby*, 270 S.C. at 142, 241 S.E.2d at 417; *Cathcart*, 307 S.C. 322, 414 S.E.2d 811. On the other hand, both she and Stone filed other documents under penalty of perjury claiming they were married. *Barker*, 330 S.C. at 366, 499 S.E.2d at 506. Both sides presented evidence that the parties did/did not introduce themselves to others as married over the years. *Id*. at 364, 499 S.E.2d at 505. The parties signed some contracts jointly, but many more were only in one's name or the other's. *Owens*, 320 S.C. at 546, 466 S.E.2d at 375. Finally, the parties shared at least one checking account, but Thompson disputed Stone's assertion that they shared several. *Id*.

The closest the parties came to the requisite meeting of the minds, in our opinion, was from 2005-2008, when Thompson indicated she was married to Stone, at least for certain purposes. It began with a medical intake form dated May 31, 2005, which only she signed, but continued that year with several documents both parties signed. These included a mortgage loan application stating they were married followed by mortgage documents listing the parties as husband and wife. Mortgage documents from December 2006 and January 2007 likewise listed the parties as married. Thompson signed a transfer of insurance from Stone to herself that indicated she was his wife as of October 2008. She finally listed herself as married on another medical intake form with a different doctor in December 2008, which she sought to change to "single" two weeks after this case was filed.

However, these documents are undercut by others from the same period, including Thompson's continued tax filings as single, Stone's Costa Rican documents wherein he listed himself as single, and a 2008 reconciliation agreement signed by both parties in which they agreed they had preserved their unmarried status. Thompson further explained the parties signed the financial documents as married during this time because banks were more closely scrutinizing mortgage loans.[10] While we in no way condone false statements in pursuit of a financial

---

[10] This calls to mind yet another reason to abolish common-law marriage, as the *Stamos* court recognized:

benefit, we do not believe these documents evidence the necessary intent to prove the parties were common-law married.

It is clear the parties intended to be in a committed relationship and business partnership together, but their conduct in living together, raising children, and running the business does not demonstrate they each intended to be married and knew the other intended the same. Furthermore, because our decision constitutes a reversal on the merits, we likewise reverse the family court's award of attorney's fees. *Chisholm*, 396 S.C. at 510-11, 722 S.E.2d at 224.

## CONCLUSION

Based on the foregoing, we **REVERSE** the family court's decision.

**BEATTY, C.J., KITTREDGE, FEW and JAMES, JJ., concur.**

---

[C]ouples may swear in applying for benefits that they are man and wife, but file tax returns averring under penalty of perjury that they are single. One attorney in oral argument, when asked how he could explain affidavits to the IRS inconsistent with the testimony of his client in the litigation then before the court, replied matter-of-factly that he assumed it lowered their tax liability. What is truly astonishing is not that parties take inconsistent positions to gain advantage, but that they seem to see nothing particularly inappropriate in their chameleon-like behavior. We must conclude that this court can no longer place its imprimatur on a rule which seems to be a breeding ground for such conduct and its attendant disrespect for the law itself.

831 A.2d at 1281.