# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Malinda J. Sullivan-Carter, Appellant,

v.

Sammy Joe Russell Carter, Respondent.

Appellate Case No. 2019-001841

Appeal From Kershaw County
Rosalyn Frierson-Smith, Family Court Judge
Gwendlyne Y. Jones, Family Court Judge

Opinion No. 5980
Heard December 6, 2022 – Filed April 19, 2023

## REVERSED IN PART, VACATED IN PART

Miles Edward Coleman, of Nelson Mullins Riley &
Scarborough, LLP, of Greenville, and Jacob Daniel
Taylor, of Nelson Mullins Riley & Scarborough, LLP, of
Denver, Colorado, both for Appellant.

Ryan W. Lane, of The Lane Law Firm, LLC, of
Columbia, for Respondent.

**THOMAS, J.:** In this family court action filed by Malinda J. Sullivan-Carter
against Sammy Joe Russell Carter, Malinda appeals, arguing the family court erred
in (1) finding a common-law marriage existed; (2) equitably dividing the parties'
property; and (3) awarding Sammy attorney's fees. We reverse in part and vacate
in part.

## I.  FACTS

Malinda filed this "Action to Find Marriage Void" on February 21, 2017.  Sammy answered and counterclaimed, seeking, *inter alia*, a finding of a common-law marriage, equitable distribution, and attorney's fees.  The family court bifurcated this action, and the first hearings were held in April and August of 2018.  During these hearings, the parties litigated the issue of whether a common-law marriage existed.[1]

The parties began living together in 1992 or 1993 and were married in July 1994.  At the time, Sammy believed he had been twice-divorced.  In 1995, Sammy learned his first marriage was not dissolved.  Malinda testified she sought legal counsel and was advised to remarry or to "keep everything separate."  Sammy's divorce from his first wife was not final until August 25, 1995.  Malinda testified she thereafter asked Sammy if he wanted to get married.  According to Malinda, Sammy wanted to "leave it like it is."  Malinda testified she continued to keep her affairs separate and considered herself unmarried.  Sammy testified he told Malinda he did not want to get married again because they were already married.  Sammy claimed he still referred to Malinda as his wife, but when they got into an argument, he told her "to consider herself divorced."

Throughout their purported marriage, the parties lived on property at Rocky Branch Lane, which was titled solely in Malinda's name.  Sammy admitted Malinda made the mortgage payments on the Rocky Branch Lane property.  In approximately 2003, the parties purchased two contiguous lots on Sessions Road.  The installment notes on the lots on Sessions Road were solely in Malinda's name.  Sammy claimed they were in Malinda's name because he owed back taxes.  Both parties contributed to the monthly payments on the lots and improvements, such as a well, driveway, and septic tank.

Sammy testified he worked for himself doing carpentry, had an eighth-grade education, and could read "a little bit" of "basic information."  He claimed he was

---

[1] Like our Chief Justice of the Supreme Court of South Carolina, we find bifurcation in family court is generally ill-advised.  *See Stone v. Thompson* (*Stone II*), 426 S.C. 291, 296, 826 S.E.2d 868, 871 (2019) (Beatty, C.J., concurring) ("I write separately to express my displeasure with the manner of trial of this case.  In my view, bifurcation in a domestic relations case should be rare if ever at all.").

in good health and earned approximately $1,600 per month. Sammy testified he considered the money he earned to be his money. According to Sammy, he did not have a bank account. He testified he gave Malinda cash for their shared auto insurance premiums, money toward the Sessions Road property payments, and the electricity bills. He also claimed he sometimes paid for groceries and gave money to Malinda when she needed it. Sammy claimed he received a birthday card from Malinda's mother that was for a "son-in-law." Malinda's mother, Nancy Barber, denied she sent the card. Sammy introduced a layaway receipt indicating he purchased a curio cabinet as a gift for Malinda. The receipt stated, "This is a surprise Christmas gift for wife. Layaway. Hold for delivery . . . ."

Malinda testified she has health problems, including heart issues requiring two open-heart surgeries, chronic obstructive pulmonary disease, bursitis, and a brain aneurysm. She explained she has been on permanent disability since one of her open-heart surgeries. Her financial declaration indicated a monthly income of $1,410. Malinda testified she kept her own, separate bank account. She explained she declared bankruptcy after her open-heart surgery while waiting for her disability to be approved. She testified Sammy was not affected by the bankruptcy.[2] According to Malinda, the parties kept "[p]retty darn separate" finances. Malinda testified Sammy did not give her any money except exactly what was due on the few bills he paid. Malinda introduced her tax returns from approximately 1993-2010, which indicated she filed as Head of Household and claimed her children as dependents. Malinda denied Sammy ever owed back taxes, explaining she offered to help Sammy but he refused to file taxes.

Both parties were named on an auto insurance policy, and Sammy had been covered under Malinda's employer's health insurance for "a few years" when she worked for Mack's Truck Co. According to Malinda, the parties shared the auto insurance policy to get the multi-vehicle discount. The parties' vehicles were always independently, not jointly, owned.

Malinda's son, Charlton Richard Carter, III, testified he was thirteen years old and his sister, Megan Ray, was approximately eight years old when Malinda met Sammy. Charlton testified he and Megan both referred to Sammy as Sammy, never as father or daddy. Charlton maintained he lived with his father and had never lived with the parties.

---

[2] Sammy acknowledged Malinda had to file for bankruptcy on her own.

Megan testified her two children called Sammy "Poppy" and he had "an active and ongoing relationship" with the children. Megan testified the parties lived on the Rocky Branch Lane property where Megan grew up. According to Megan, the parties referred to each other as husband and wife and she referred to Sammy as her stepfather. Bill Ray, Megan's husband, testified he had known the parties for fifteen years. Bill maintained Malinda introduced Sammy as her husband when Bill first met the parties. Travis Dinkins, a Rocky Branch Lane neighbor, testified he had known Sammy for twenty years, lived near the parties for eight years, and witnessed their continuous cohabitation. According to Dinkins, the parties held themselves out as being married.

The parties separated numerous times during the alleged marriage for up to a month each time. Sammy admitted that during one separation, he lived with another woman for a month. Malinda testified she stayed with Sammy despite his numerous affairs because she loved him, not as a husband, but as a lover, best friend, and companion.

By order filed November 2, 2018, the family court found a common-law marriage existed between the parties. Malinda did not immediately appeal the order finding a common-law marriage, and the hearing on the remainder of the action, including a divorce and equitable distribution, was held in August 2019 before a different family court judge. The court entered a decree of divorce, equitably distributed the marital estate, and awarded Sammy $4,500 in attorney's fees. This appeal follows.

## II.  STANDARD OF REVIEW

"Appellate courts review family court matters *de novo*, with the exceptions of evidentiary and procedural rulings." *Stone v. Thompson* (*Stone III*), 428 S.C. 79, 91, 833 S.E.2d 266, 272 (2019). "*De novo* review permits appellate court fact-finding, notwithstanding the presence of evidence supporting the trial court's findings." *Lewis v. Lewis*, 392 S.C. 381, 390, 709 S.E.2d 650, 654–55 (2011). "Even under de novo review, the longstanding principles that trial judges are in superior positions to assess witness credibility and that appellants must show the trial judge erred by ruling against the preponderance of the evidence remain applicable." *Stone III*, 428 S.C. at 91–92, 833 S.E.2d at 272; *see Powell v. Dolin*, 437 S.C. 499, 507, 879 S.E.2d 26, 30 (Ct. App. 2022) (citing *Stone III* and applying the de novo standard of review in a family court action litigating the existence of a common-law marriage).

## III.  LAW/ANALYSIS

## A.     Appealability

Sammy argues this court lacks jurisdiction to hear the appeal of the 2018 family court order establishing the parties' common-law marriage due to Malinda's failure to (1) immediately appeal the order and (2) list the order in her notice of appeal. We disagree.

Sammy maintains Malinda's failure to immediately appeal the 2018 order divested this court of jurisdiction to hear the appeal.  In *Stone v. Thompson*, (*Stone I*), the family court bifurcated the issues of common-law marriage from the divorce and equitable distribution action and found the parties were common-law married.  418 S.C. 599, 601–02, 795 S.E.2d 49, 50–51 (Ct. App. 2016), *rev'd*, 426 S.C. 291, 826 S.E.2d 868 (2019).  One of the parties appealed, and this court dismissed the appeal, finding the order was not immediately appealable.  *Id*. at 607, 795 S.E.2d at 53.  In reversing this court, our supreme court found the order was immediately appealable under our general appealability statute, South Carolina Code Section 14-3-330(1), because it involved the merits of the causes of action.[3]  *Stone II*, 426 S.C. at 292–93, 826 S.E.2d at 868–69.  The court in *Stone*, however, did not mandate that an order granting a common-law divorce must be immediately appealed.  "Some 'interlocutory' orders are immediately appealable because they affect the merits or a substantial right, but the governing statute does not require an immediate appeal.  Other interlocutory orders must be appealed immediately, or the right to appeal is lost."  15 S.C. Jur. *Appeal & Error* § 70 (1992).

Relying on *Stone II*, we conclude the intermediate order finding a common-law marriage existed is immediately appealable under section 14-3-330(1) because it involved the merits of the causes of action.  However, we do not find Malinda was

---

[3] Section 14-3-330(1) provides for appeal of an intermediate order as follows:

> Any intermediate judgment, order or decree in a law case involving the merits in actions commenced in the court of common pleas and general sessions . . . provided, that if no appeal be taken until final judgment is entered the court may upon appeal from such final judgment review any intermediate order or decree necessarily affecting the judgment not before appealed from.

S.C. Code Ann. § 14-3-330(1) (2017).

either *required* to immediately appeal the order or to specifically list the order in her notice of appeal. *See* § 14-3-330(1) (concluding if a party timely files a notice of appeal from a final judgment, "the court may upon appeal from such final judgment review any intermediate order or decree necessarily affecting the judgment not before appealed from"); *see generally Lancaster v. Fielder*, 305 S.C. 418, 421, 409 S.E.2d 375, 377 (1991) ("[U]nder Section 14-3-330(1), a party need not challenge the final judgment itself in order to contest an intermediate judgment."); *State v. Cooper*, 342 S.C. 389, 397 n.3, 536 S.E.2d 870, 875 n.3 (2000) (finding the State's failure to list the final judgment in its notice of appeal did not preclude the court's review of intermediate and post-judgment orders).

## B.     Common-Law Marriage

Malinda argues the family court erred in finding a common-law marriage existed. We agree.

The order establishing the existence of a common-law marriage was filed on November 2, 2018, several months before our supreme court prospectively abolished common-law marriage in *Stone III*.[4] The court relied on (1) the parties' cohabitation for a long period of time after the impediment to their marriage was removed; (2) Sammy's illiteracy; (3) Malinda's filing of tax returns as Head of Household both before and after the impediment was removed; (4) Malinda's failure to change the way she handled her finances after the impediment was removed; (5) Malinda's admission the parties were lovers, best friends, and companions; and (6) Sammy's belief the first marriage ceremony was sufficient after the impediment was removed.

In finding the existence of a common-law marriage, the family court relied on a probate action, *Campbell v. Christian*, 235 S.C. 102, 110 S.E.2d 1 (1959), *abrogated by Stone v. Thompson* (*Stone III*), 428 S.C. 79, 833 S.E.2d 266 (2019),

---

[4] The court in *Stone III* also changed the evidentiary burden of proof to apply in future common-law marriage litigation. 428 S.C. at 89, 833 S.E.2d at 271. "To sum up, in the cases litigated [after *Stone III*], a party asserting a common-law marriage is required to demonstrate mutual assent to be married by clear and convincing evidence. Courts may continue to weigh the same circumstantial factors traditionally considered, but they may not indulge in presumptions based on cohabitation, no matter how apparently matrimonial." *Id*.

and found this case had similar facts because the alleged common-law spouse in *Campbell* was illiterate. We find *Campbell* distinguishable.

> Campbell married Mattie Grey. They had no children.
>
> While married to Mattie, Campbell had illicit relation with Beulah Poole, an illiterate, ignorant girl; and on November 18, 1921, she bore him a child. He was then forty-five, she fourteen.
>
> On January 11, 1923, Mattie having died, Campbell married her niece, Gertrude. One child, Cornelia, was born to them on November 16, 1923. During this marriage, Campbell's relations with Beulah continued, with the result that she had two more children by him, one on January 28, 1925, the other on January 18, 1928. On December 10, 1927, he divorced Gertrude . . . .
>
> About a year after the divorce, Beulah came into his home and took the name of Campbell, and they lived together for more than twenty-four years, during which five children were born to them, one in 1931, one in 1932, one in 1935, one in 1938, and one in 1943. In the spring of 1954[,] he deserted her and moved to another house in the city of Anderson.

235 S.C. at 105, 110 S.E.2d at 2–3.

In finding a common-law marriage existed, the court explained,

> There is in the record before us considerable evidence that from the time that Campbell took Beulah into his home, a year or so after his divorce from Gertrude, he and she lived together as husband and wife, and that they were so recognized in the community. An elderly neighbor, who had known Campbell throughout the latter's life, testified that 'they lived openly as husband and wife'; that 'he carried the children around with him and they went by the name of Campbell and went to school under the name of Campbell'; and that the general

> public considered them as man and wife. One of
> Campbell's sons testified, without objection, that when
> strangers came to the house Campbell, after introducing
> himself, would introduce Beulah as his wife. His
> daughter Myrtis testified that during the many years that
> Campbell and Beulah lived together she visited in their
> home and understood that they were married; and that the
> people of the community knew them as man and wife.

*Id*. at 106, 110 S.E.2d at 3. The court also noted that the birth certificates of the children born in 1921 and 1925 indicated either no father or Campbell as the father, but not married. *Id*. However, the birth certificates of the children born in 1928, 1935, and 1943 named both Campbell and Beulah as parents and indicated the parents were married. *Id*. at 107, 110 S.E.2d at 3. The court noted that "[t]hroughout the record of this case Beulah appears as a woman illiterate, uneducated, and of childlike simplicity." *Id*. at 108, 110 S.E.2d at 4. The court found "there was ample evidence . . . to support the conclusion that after the barrier to their marriage had been removed by Campbell's divorce from Gertrude, he and Beulah entered into a new mutual agreement whereby their previously illicit relationship was terminated and a valid common-law marriage established." *Id*. at 109, 110 S.E.2d at 5.

Here, although Sammy claimed to be somewhat illiterate, there is evidence he was educated through the eighth grade, he was financially independent as a carpenter/handy man, and he recognized documents handed to him to identify in court. We find the family court erred in relying solely on *Campbell*. Under our *de novo* review, we find Sammy failed to prove a common-law marriage.

In general, "[a] common-law marriage is formed when two parties contract to be married." *Callen v. Callen*, 365 S.C. 618, 624, 620 S.E.2d 59, 62 (2005). There must be mutual assent to the marriage: "the intent of each party to be married to the other and a mutual understanding of each party's intent." *Id*. Cohabitation is a factor, but it is not alone dispositive. *Id*. When "'apparently matrimonial' cohabitation" exists, "a rebuttable presumption arises that a common-law marriage was created." *Id*. However, this rebuttable presumption does not exist when an impediment to marriage initially exists. *Id*. at 624, 620 S.E.2d at 62. The court in *Callen* explained:

> When, however, there is an impediment to marriage, such
> as one party's existing marriage to a third person,

> no common-law marriage may be formed, regardless
> whether mutual assent is present.  Further, after the
> impediment is removed, the relationship is not
> automatically transformed into a common-law marriage.
> Instead, it is presumed that relationship remains non-
> marital.  For the relationship to become marital, "there
> must be a new mutual agreement either by way of civil
> ceremony or by way of recognition of the illicit relation
> and a new agreement to enter into a common[-]law
> marriage."

*Id.* (quoting *Kirby v. Kirby*, 270 S.C. 137, 141, 241 S.E.2d 415, 416 (1978); *see Yarbrough v. Yarbrough*, 280 S.C. 546, 551, 314 S.E.2d 16, 19 (Ct. App. 1984) ("In order for a common[-]law marriage to arise, the parties must agree to enter into a common[-]law marriage after the impediment is removed, though such agreement may be gathered from the conduct of the parties.").

In this case, we do not find evidence of a new, mutual agreement by the parties after Sammy's 1995 divorce.  To the contrary, Malinda requested a new ceremony, and Sammy's response was inconsistent at best when he alternately told Malinda he did not want to get married again because they were already married, but other times told her "to consider herself divorced."  Sammy's possible misunderstanding of the parties' status does not equate to a mutual agreement.  *See Callen*, 365 S.C. at 626, 620 S.E.2d at 63 ("A party need not understand every nuance of marriage or divorce law, but he must at least know that his actions will render him married as that word is commonly understood."); *see generally Stone III*, 428 S.C. at 89, 833 S.E.2d at 271 ("A party is not required to show his opponent had legal knowledge of common-law marriage; ignorance of the law remains no excuse.  He must demonstrate that both he and his partner mutually intended to be married to one another . . . .").

We also find the reliance by the family court on Malinda's tax filings as supporting a common-law marriage due to her filing as Head of Household with either one or two dependent children was error.  Tax filing as Head of Household indicates an unmarried status.  *See* Jacob Goldin & Zachary Liscow, *Beyond Head of Household: Rethinking the Taxation of Single Parents*, 71 Tax L. Rev. 367, 367 (2018) ("Since 1951, unmarried taxpayers with qualifying dependents—usually children—have been able to claim the [H]ead of [H]ousehold filing status . . . .); *Powell*, 437 S.C. at 511–12, 879 S.E.2d at 33 (considering a party's filing of tax returns as Head of Household as a factor "decidedly against a finding of common[-

]law marriage").  Although Sammy presented some testimony that the parties held themselves out to a neighbor and Malinda's son-in-law as married, the documentary evidence showed a contrary intent by Malinda.  She kept a separate bank account, filed taxes as Head of Household, was the sole owner of the alleged "marital" residence, was the only party listed on its mortgage, filed bankruptcy as an individual, and owned the Sessions Road properties exclusively in her name.  We find Sammy's documentary evidence, which included a receipt for a curio cabinet and the seller's letters to the parties regarding the Sessions Road properties, failed to overcome the presumption that the relationship remained non-marital after the impediment was removed.

**C.     Equitable Distribution**

Malinda argues the court erred in equitably distributing property that was non-marital.  We agree.

Because no common-law marriage existed between the parties, the family court lacked jurisdiction to equitably apportion Malinda's non-marital property.  *See* S.C. Code Ann. § 20-3-630(B) (2014) ("The court does not have jurisdiction or authority to apportion non[-]marital property.").

**D.     Attorney's Fees**

Malinda argues the family court erred in awarding Sammy $4,500 in attorney's fees.  Because we reverse the finding of a common-law marriage, we likewise reverse the award of attorney's fees.  *See Rogers v. Rogers*, 343 S.C. 329, 334, 540 S.E.2d 840, 842 (2001) ("[S]ince the beneficial result obtained by counsel is a factor in awarding attorney's fees, when that result is reversed on appeal, the attorney's fee award must also be reconsidered."); *Stone III*, 428 S.C. at 94, 833 S.E.2d at 274 ("[B]ecause our decision constitutes a reversal on the merits, we likewise reverse the family court's award of attorney's fees.").

**IV.     CONCLUSION**

Based on the foregoing, we reverse the finding of a common-law marriage and the award of attorney's fees.  We vacate the equitable distribution award.

**REVERSED IN PART, VACATED IN PART.**

**WILLIAMS, C.J., and LOCKEMY, A.J., concur.**